IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1) Rhonda Mengert<br><br>                       *Plaintiff*<br><br>v.<br><br>1) United States of America<br><br>                       *Defendant* | Case No. 21-CV-00443-CVE-SH<br><br>**COMPLAINT** |

## **INTRODUCTION**

1) Plaintiff Rhonda Mengert ("Mengert"), a frequent flyer, United States citizen, and TSA PreCheck-cleared grandmother, was a ticketed passenger traveling through Tulsa International Airport ("TUL") on Mother's Day (May 12th), 2019.

2) Defendant United States of America is employer of two screeners of the Transportation Security Administration ("TSA") who, after Mengert submitted to a "pat-down" search as requested by the screeners, then subjected Mengert to a strip search after the pat-down revealed that Mengert was wearing a common feminine hygiene product.

3) The strip search, during which the screeners required – without consent or lawful authority – that Mengert expose her genitals to them, was in direct opposition to written TSA procedures, as well as the Fourth Amendment to the United States Constitution, for which Mengert seeks damages.

## **PARTIES**

4) Plaintiff Mengert is a natural person living in Las Vegas, NV.

5) Defendant United States of America is the sovereign nation and proper defendant for claims brought under the Federal Tort Claims Act, 28 U.S.C. § 1346.

## JURISDICTION & VENUE

6) Personal jurisdiction is proper over the United States of America in any of its federal courts.

7) Subject matter jurisdiction is proper over the Federal Tort Claims Act claims because they arise under federal law.

8) Venue is proper because the incident that gave rise to the complaint occurred within the Northern District of Oklahoma.

## ALLEGATIONS OF FACT

9) On May 12th, 2019, at or around 11:45 AM, Mengert arrived at Tulsa International Airport.

10) Mengert possessed a valid boarding pass for a flight departing TUL to Las Vegas-McCarran International Airport later that day.

11) Mengert also held TSA PreCheck clearance – a trusted traveler program run by the TSA whereby passengers submit to a background check and are "cleared" by the TSA as low security risk and thereafter are subjected to reduced security screening requirements.

12) Mengert approached the TSA screening line, as was required of her as a prerequisite to boarding her flight, and presented a valid photo identification and her boarding pass – identifying her as a PreCheck-cleared individual – to a TSA travel document checker, who granted her access to the PreCheck area of the screening checkpoint.

13) Inside of the checkpoint, the TSA had a standard walk-through metal detector present for the screening of PreCheck passengers.

14) It is well-known among travelers with metal joint implants that such implants will always cause a false alarm during metal detector screening.

15) TSA body scanners, however, are able to properly clear passengers with metal implants because they do not detect items beneath the skin.

16) Accordingly, TSA procedure, upon being notified by a passenger that they have a metal implant, is to screen using a body scanner if available.

17) Mengert informed a TSA screener running the metal detector that she had a metal joint implant and, therefore, requested to be screened via body scanner.

18) Mengert indeed has a metal joint implant.

19) Mengert was screened via body scanner, but at the conclusion of that screening she was informed that she would have to submit to additional screening via pat-down.

20) Mengert agreed to submit and was compliant, non-argumentative, and did nothing that a reasonable screener would consider suspicious or meriting of additional screening.

21) TSA pat-down screening involves touching of "groin" areas using the back of screener's hands, as well as sliding of hands along the inside of the legs upwards from ankles until the screener "meets resistance."

22) The TSA uses the word "groin" and the phrase "meet resistance" because it makes people uncomfortable to say the obvious: that the search involves the touching, albeit through clothing, of the genitals of passengers.

23) During the "groin" and/or "meeting resistance" part of the pat-down, the screener touched an ordinary feminine hygiene product that Mengert was wearing underneath her clothing.

24) Literally millions of women in the United States wear such items on any given day, and therefore finding one during a TSA pat-down is not at all an uncommon occurrence.

25) The TSA does not publish its policy on how travelers wearing feminine hygiene products are to be screened during or after a pat-down because it considers the policy – a part of the TSA's

"Screening Checkpoint Standard Operating Procedures" – to be Sensitive Security Information, 49 CFR § 1520, and thus not releasable to the public.

26) However, upon information and belief, TSA policy is that there is no additional screening required: the pat-down is completed as normal, including a test for explosive trace residue on the gloves of the screener that, had the passenger been concealing explosives, would have been transferred to the gloves during the pat-down.

27) Regardless of what the exact details are, TSA has been clear and consistent in every public statement of which Plaintiff is aware that TSA screenings *never* include a strip search, and passengers will *never* be asked to remove anything but outer garments (jackets, sweatshirts, *etc*.). <u>See</u> Exhibit 1, "Screening of Elderly Passenger at JFK," Bob Burns (U.S. Transportation Security Administration), December 4th, 2011 ("**TSA does not include strip searches in its protocols**," *emphasis in original*).

28) Yet, after the pat-down was concluded and the screener tested her gloves for explosive trace – a test which came back clear – Mengert was told she was not done.

29) A screener informed Mengert that she must go to a private room to be "cleared."

30) That screener and another escorted Mengert to the private room, entered, and closed the door behind them.

31) Inside the room, the screeners told Mengert that they must "clear the area" where the feminine hygiene product was detected.

32) Mengert stated that she did not understand what they were asking her to do.

33) The screeners informed Mengert that she was to take down her pants and underwear down to her knees and remove the feminine hygiene product for their visual inspection.

34) Mengert objected to the proposition that she be subject to such a strip search.

35) The screeners informed Mengert that her compliance was required.

36) Mengert complied with the screeners demand, exposing her genitals and underwear the screeners.

37) Having satisfied the screeners request and revealing that she was not carrying any prohibited items, Mengert then asked to leave, and three times her demand was ignored without any reason apparent.

38) Mengert asked a fourth time, and was granted permission to leave.

39) As would be expected, Mengert experienced severe emotional distress during and after the incident.

40) In particular, during the incident, Mengert experienced symptoms of a panic attack, including racing heart, shortness of breath, uncontrollable shaking, and nausea.

41) Since the incident, Mengert experiences recurrent, unwanted, distressing memories of the event.

42) Whenever Mengert is reminded of the event, she experiences the same symptoms described in paragraph 40: racing heart, shortness of breath, uncontrollable shaking, and nausea.

43) Whenever Mengert is reminded of the event, she also experiences additional symptoms: fear of loss of control of her body, sweating, tightness in throat, headache, and hot flashes, followed by emotional numbness.

44) In particular, Mengert's uncontrollable shaking is particularly severe, such that she cannot control the movement of her arms and that the trembling of her legs requires her to sit to avoid falling.

45) As a result, Mengert attempts to avoid thinking about the event or talking with others about the event.

46) Mengert is required to regularly travel via air for her job – typically more often than monthly – and has had to travel on many additional occasions between the date of the incident and the date of the filing of the original complaint in this action.

47) Mengert is thus regularly reminded of the incident as a result of her frequent need to traverse TSA checkpoints, and experiences the symptoms described in paragraphs 39 – 44 (and has found that even approaching non-TSA security, outside of the airport causes a relapse).

48) In any event, Mengert has relived the physical and psychological symptoms described in paragraphs 39 – 44 no less than several times per month since the incident.

## CLAIMS FOR RELIEF

### Count 1 – False Imprisonment
*via Federal Tort Claims Act*

49) The Fourth Amendment to the U.S. Constitution prohibits "unreasonable searches and seizures," and in general, a warrant or an exception to the warrant requirement is required before the government may conduct a search without the consent of the searched.

50) The "administrative search doctrine" allows the TSA to conduct some level of limited warrantless searches under the theory that the searches are aimed at a public safety concern rather than uncovering evidence of criminality (or, in the alternative, under the theory that by presenting one's self at the TSA checkpoint, one is consenting to the search).

51) The exception to the warrant requirement granted by the administrative search doctrine is, however, not an exception to the reasonableness requirement of the Fourth Amendment.

52) The TSA has publicly stated that they "never" strip search passengers, and has never contradicted that statement; therefore, Mengert cannot be said to have "consented" to this intrusive search (especially given her verbal objections to the same and the screeners' admonition that she was required to comply) because she had no advance notice of the same.

53) Further, the screeners were, or should have been, aware that the written standard operating procedures that directly controlled their conduct on the job prohibit strip searches.

54) The conducting of a humiliating strip search, in clear violation of agency policy, on a passenger known to have been pre-cleared as low risk, for no reason other than wearing an item that nearly every woman in the country has worn many times in her life, is a quintessential unreasonable search.

55) Any reasonable screener in the position of these screeners would have known that this search was prohibited by law and by agency policy, and would be a violation of Mengert's rights

56) Thus, the screeners involved had no privilege to detain Mengert and force her to submit to a strip search.

57) Mengert was detained without her consent from the moment the screeners forced her to go to the private room without privilege.

58) Mengert was conscious of her confinement at all times throughout the incident.

59) Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346, Defendant United States of America is therefore liable to Mengert for false imprisonment.

**Count 2 – Intentional Infliction of Emotional Distress**
*via Federal Tort Claims Act*

60) Plaintiff repeats and re-alleges the claims of ¶¶ 49 – 58.

61) A strip search is a universally humiliating experience, the offensive nature of which is immediately apparent to any human.

62) The screeners forced Mengert to undress and expose her most intimate areas to them, a proposition made even more embarrassing and disturbing given Mengert's use and need for a feminine hygiene product.

63) The screeners intend their directions to cause Mengert to undress.

64) The screeners knew or should have known that doing so would cause Mengert severe emotional distress.

65) Mengert did experience severe emotional distress, both during the incident and regularly reoccurring thereafter, as described in paragraphs 43 – 48.

66) An employee of the government, without cause and illegally, ordering a private citizen to submit to a strip search is extreme and outrageous, even moreso when the basis for doing so is the wearing of a feminine hygiene product.

67) Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346, Defendant United States of America is therefore liable to Mengert for intentional infliction of emotional distress.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

i. Compensatory damages for loss of liberty, the unconstitutional search, and garden-variety emotional distress, in an amount to be determined by a jury.

ii. Cost of the action.

iii. Any other such relief as the Court deems appropriate.

Dated: Tulsa, OK

October 13th, 2021

Respectfully submitted,

_/s/Jonathan Corbett_
Jonathan Corbett, Esq.
Attorney for Plaintiff (Lead Counsel)
CA Bar #325608 (*pro hac vice pending*)
958 N. Western Ave. #765
Hollywood, CA 90029
E-mail: jon@corbettrights.com
Phone: (310) 684-3870
FAX:   (310) 675-7080