# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1) RHONDA MENGERT,

    Plaintiff,

    v.

(1) UNITED STATES OF AMERICA,

    Defendant.

Case No. 21-CV-00443-CVE-SH

**Defendant United States of America's Motion to Dismiss**

## Table of Contents

Table of Authorities ................................................................................................ ii

Brief in Support ..................................................................................................... 1

I.  Background and Summary of Argument ...................................................... 1

II.  Statutory Framework ................................................................................. 3

A. The Federal Tort Claims Act ............................................................. 3

B. TSA and the Aviation and Transportation Security Act ..................... 4

III.  Standards of Review .................................................................................. 5

A. Standard for dismissal under Rule 12(b)(1) ........................................ 5

B. Standard for dismissal under Rule 12(b)(6) ........................................ 6

IV.  Argument ................................................................................................... 6

A. The Court lacks subject-matter jurisdiction over Plaintiff's claims. ................... 6

1. The plain language of the law enforcement proviso shows that TSA
security screeners are not "investigative or law enforcement officers." ......... 7

2. The legislative history of the proviso confirms its narrow scope. .................. 12

3. ATSA confirms that TSA screeners are not empowered by law to
execute searches, to seize evidence, or to arrest. ............................................. 13

4. Any ambiguity regarding the scope of the law enforcement proviso
should be resolved narrowly in favor of sovereign immunity. ........................ 15

5. The better-reasoned decisions by other courts support the conclusion that
TSA screeners are not "investigative or law enforcement officers" within
the meaning of the law enforcement proviso. .................................................. 16

6. The IIED claim arises out of allegations of false imprisonment. ................... 20

B. Plaintiff fails to state a claim for IIED. .............................................. 22

V.  Conclusion ................................................................................................. 29

## Table of Authorities

### Cases

*Abramski v. United States*, 573 U.S. 169 (2014).................................................................. 7

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................... 6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .............................................................. 6

*Blackburn v. United States*, No. 20-8005, 2021 WL 3027979 (10th Cir. Jul. 19, 2021)... 20, 21

*Breeden v. League Servs. Corp.*, 575 P.2d 1374 (Okla. 1978) ......................................... 23, 25

*Bryson v. City of Edmond*, 905 F.2d 1386 (10th Cir. 1990)................................................. 6

*Carrero v. Farrelly*, No. 16-cv-3939, 2018 WL 1761957 (D. Md. Apr. 12, 2018) ...............11

*Castenada v. INS*, 23 F.3d 1576 (10th Cir. 1994)............................................................. 5

*Chisholm v. United States*, No. 08-cv-4149, 2009 WL 10710968,
(D.S.C. Nov. 10, 2009) ............................................................................................. 11, 18

*City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) ............................................................11

*Clark v. Martinez*, 543 U.S. 371 (2005) ..........................................................................10

*Corbett v. TSA*, 568 F. App'x 690, 700–02 (11th Cir. 2014),

*cert. denied*, 135 S. Ct. 1559 (2015)...............................................................................16

*Corbett v. T.S.A.*, 767 F.3d 1171 (11th Cir. 2014)........................................................ 15, 24

*Corbett v. TSA*, 930 F.3d 1225 (11th Cir. 2019) ...............................................................24

*Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379 (10th Cir. 1991).......................... 27, 28

*Davis ex rel. Davis v. United States*, 343 F.3d 1282 (10th Cir. 2003) .................................. 6

*Dolan v. U.S. Post. Serv.*, 546 U.S. 481 (2006) ................................................................ 9

*Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003) .......................................... 26, 27

*Eddy v. Brown*, 715 P.2d 74 (Okla. 1986) ......................................................................25

*FAA v. Cooper*, 566 U.S. 284 (2012)..............................................................................15

*Frey v. Town of Jackson*, No. 19-cv-50 (D. Wyo. Dec. 2, 2019) .......................................10

*Garrett's Worldwide Enters., LLC v. United States*, No. 14-cv-2281, 2015 WL 11825762, (D. Kan. Mar. 16, 2015).......................................................................................... 17, 18

*Gaylord Entm't Co. v. Thompson*, 958 P.2d 128 (Okla. 1998)...........................................23

*George v. Rehiel*, 738 F. 3d 562 (3d Cir. 2013)................................................................24

*Gesty v. United States*, 400 F. Supp. 3d 859 (D. Ariz. Jul. 19, 2019) ...................................19

*Harms v. United States*, 972 F.2d 339, 1992 WL 203942, (4th Cir. Aug. 24, 1992) .............20

*Hernandez v. United States*, 34 F. Supp. 3d 1168 (D. Colo. 2014) ......................................10

*Iverson v. United States*, 973 F.3d 843 (8th Cir. 2020)..................................................19, 20

*K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988) .............................................................. 7

*Lane v. Pena*, 518 U.S. 187 (1996)...................................................................................... 5

*Leytman v. United States*, No. 18-3859, 2020 WL 1487681 (2d Cir. Mar. 25, 2020) ...........19

*Lorsch v. United States*, No. 14-cv-2202, 2015 WL 6673464 (C.D. Cal. Oct. 29, 2015).......17

*Los Angeles County v. Rettele*, 550 U.S. 609 (2007) .............................................................. 9

*Loughrin v. United States*, 573 U.S. 351 (2014) .................................................................. 8

*Martin v. United States*, No. 15-cv-278, 2016 WL 4542289 (S.D. Cal. Aug. 31, 2016)........17

*Mengert v. TSA, et al.*, No. 19-cv-00304-CVE-JFJ (N.D. Okla. filed Jun. 5, 2019) ...........1, 4

*Merritt v. Shuttle, Inc.*, 187 F.3d 263 (2d Cir. 1999) ........................................................... 5

*Millbrook v. United States*, 569 U.S. 50 (2013) .............................................................3, 13

*Miller v. Miller*, 956 P.2d 887 (Okla. 1998) .......................................................................25

*Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656 (1989)...........................................11

*Pebsworth v. Spirit AeroSystems, Inc.*, No. 16-cv-644, 2018 WL 1569496,
(N.D. Okla. Mar. 30, 2018)................................................................................... 25, 26

*Pellegrino v. United States*, 937 F.3d 164 (3d Cir. 2019)..............................................*passim*

*Popovic v. United States*, 175 F.3d 1015, 1999 WL 228243 (4th Cir. Apr. 20, 1999)............21

*Richards v. United States*, 369 U.S. 1 (1962) .....................................................................22

*Robinson v. United States*, No. 07-cv-1496, 2008 WL 11509485 (D. Md. Mar. 18, 2008)....18

*Romero v. City of Miami*, 8 F. Supp. 3d 1321 (N.D. Okla. 2014) ........................... 23, 24, 25

*Saratoga Sav. & Loan Ass'n v. Fed. Home Loan Bank of San Francisco*, 724 F. Supp. 683
(N.D. Cal. 1989) ...............................................................................................................18

*Schovanec v. Archdiocese of Okla. City*, 188 P.3d 158 (Okla. 2008)......................................23

*Sheppard v. United States*, 537 F. Supp. 2d 785 (D. Md. 2008) ...........................................22

*Starr v. Pearle Vision, Inc.*, 54 F.3d 1548 (10th Cir. 1995).................................................25

*Timpanogos Tribe v. Conway*, 286 F.3d 1195 (10th Cir. 2002) ............................................ 5

iii

*Torres v. Pueblo Bd. of Cnty. Comm'rs*, 229 F.3d 1165, 2000 WL 1346347 (10th Cir. 2000)... 6

*United States v. Aukai*, 497 F.3d 955 (9th Cir. 2007) ........................................................5, 11

*United States v. McCarty*, 648 F.3d 820 (9th Cir. 2011) .....................................................25

*United States v. Ramirez*, 523 U.S. 65 (1998) ................................................................... 9

*United States v. Shearer*, 473 U.S. 52, 55 (1985) ..........................................................20, 22

*Vanderklok v. United States*, 868 F.3d 189 (3d Cir. 2017).................................................. 4

*Vaupel v. United States*, 491 F. App'x 869 (10th Cir. 2012) ................................................11

*Velazquez v. Helmerich & Payne Int'l Drilling Co.*, No. 15-cv-17, 2015 WL 871339
(N.D. Okla. Feb. 27, 2015)....................................................................................... 27, 28

*Weinraub v. United States*, 927 F. Supp. 2d 258 (E.D.N.C. 2012) ................................ 14, 19

*Wheeler v. Spirit AeroSystems, Inc.*, No. 13-cv-421, 2013 WL 5520012
(N.D. Okla. Oct. 1, 2013)...........................................................................................27

*Wilson v. United States*, 959 F.2d 12 (2d Cir. 1992) ..........................................................17

*Winnebago Tribe of Neb. v. Kline*, 297 F. Supp. 2d 1291 (D. Kan. 2004)............................ 5

*Young v. City of Idabel*, 721 F. App'x 789 (10th Cir. 2018)..........................................25, 27

*Zeran v. Diamond Broadcasting*, 203 F.3d 714 (10th Cir. 2000) .............................. 26, 27, 28

**Federal Statutes**

18 U.S.C. § 2510(7)............................................................................................. 8

21 U.S.C. § 374(a)(1) ......................................................................................... 9

28 U.S.C. §§ 1346(b)(1) ............................................................................... 1, 3, 23

28 U.S.C. §§ 2671 ............................................................................................. 1

28 U.S.C. § 2680(h) ..................................................................................*passim*

29 U.S.C. § 657(a)(2) ......................................................................................... 9

42 U.S.C. § 6927(a)........................................................................................... 9

49 U.S.C. § 114(e)(1)......................................................................................... 4, 14, 17

49 U.S.C. § 44901(a) ............................................................................................*passim*

49 U.S.C. § 44903(c)(1) ........................................................................................ 5

49 U.S.C. § 44920 ...............................................................................................14

50 U.S.C. § 1809 ................................................................................................ 8

Pub. L. No. 93-253, § 2, 88 Stat. 50 (1974)...................................................... 3

Pub. L. No. 107-71, 115 Stat. 597 (2001) ........................................................ 4

**Federal Rules**

Federal Rules of Civil Procedure 12(b)(1) ...............................................................*passim*

Federal Rules of Civil Procedure 12(b)(6) ........................................................... 1 ,6 ,29

**Federal Regulations**

49 C.F.R. § 1542.215 ......................................................................................... 5

Civil Aviation Security Rules, 67 Fed. Reg. 8,340, 8,344 (Feb. 22, 2002) ........................ 5

Passenger Screening Using Advanced Imaging Technology, 81 Fed. Reg. 11,364, 11,374 (Mar. 3, 2016)...............................................................................................1, 2

**Legislative History**

120 Cong. Rec. 5287 (statements of Reps. Donohue and Wiggins) ...................................13

Federal Tort Claims Amendments: Hearings on H.R. 10439 Before the Subcomm. on Claims and Governmental Relations of the H. Judiciary Comm., 93d Cong. 18 (1974)...13

Sen. Rep. No. 93-588 (1974)............................................................................13

**Other Materials**

TSA Website, available at: https://www.tsa.gov/news/press/releases/2021/06/12/tsa-surpasses-2-million-daily-travelers-screened ...........................................7, 16

John C. Boger, Mark Gitenstein & Paul R. Verkuil, *The Federal Tort Claims Act Intentional Torts Amendment: An Interpretative Analysis*, 54 N.C. L. REV. 497, 500 (1976)....................12

Restatement (Second) of Torts § 46 ........................................................23, 27

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6), Defendant United States of America respectfully moves the Court for dismissal of Plaintiff's Complaint (Doc. 2) filed on October 13, 2021. In support of this motion, Defendant relies on the following memorandum of points and authorities and all matters of record.

<strong>Brief in Support</strong>

## I.   <u>Background and Summary of Argument</u>

Plaintiff Rhonda Mengert brings this action under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b)(1); 2671, *et seq.*, asserting the United States is liable for the Oklahoma torts of false imprisonment and intentional infliction of emotional distress (IIED) allegedly committed by employees of the Transportation Security Administration (TSA) at a security screening checkpoint in Tulsa International Airport (TUL) on May 12, 2019. The events alleged in Plaintiff's Complaint, though not admitted, are summarized below.[1]

At the checkpoint, Plaintiff was screened with a walk-through Advanced Imaging Technology (AIT) scanner. (Doc. 2, ¶¶ 15–19); *see also* Passenger Screening Using Advanced Imaging Technology, 81 Fed. Reg. 11,364, 11,365 (Mar. 3, 2016) (final rule) ("The AIT currently deployed by TSA is a millimeter wave imaging technology that can detect metallic and non-metallic objects on an individual's body or concealed in his clothing without physical contact."). The AIT scanner alarmed to indicate the possible presence of an item being carried on Plaintiff's body or in her clothing, and she was therefore required to undergo a pat-down procedure to resolve the alarm. (Doc. 2, ¶ 19); *see also* 81 Fed. Reg. at

---

[1] This action is Plaintiff's second lawsuit against the federal government based on the same alleged events. Plaintiff's prior action, *Mengert v. TSA, et al.*, No. 19-cv-00304-CVE-JFJ (N.D. Okla. filed Jun. 5, 2019), was dismissed by orders issued on November 30, 2020 (Doc. 40), and July 26, 2021 (Doc. 52), and a judgment of dismissal terminating the case was entered on July 26, 2021 (Doc. 53).

11,365 ("The technology bounces electromagnetic waves off the body to detect anomalies. If an anomaly is detected, a pat-down of the area is usually performed to determine if a threat is present."). During the pat-down, the female TSA employee who was performing the procedure felt a "feminine hygiene product" that Plaintiff was wearing inside of her underwear. (Doc. 2, ¶¶ 23). Plaintiff alleges that she was subsequently required to go with that employee and another female TSA employee to a private screening room at the checkpoint, lower her pants and underwear to remove the "feminine hygiene product" she was wearing, and show the item to the TSA employees "for their visual inspection." *Id.* at ¶¶ 30, 33, 35, 36. Plaintiff further alleges that after the visual inspection was complete, she asked to leave the private screening room three times, but the TSA employees ignored her requests, and she was not permitted to leave until she asked a fourth time. *Id.* at ¶¶ 37–38. She claims that these events caused her to "experience severe emotional distress," which manifested with the physical symptoms of "racing heart, shortness of breath, uncontrollable shaking, and nausea." *Id.* at ¶¶ 39–40. She also claims that whenever she "is reminded of the event, she experiences the same symptoms," as well as the additional physical symptoms of "sweating, tightness in throat, headache, and hot flashes." *Id.* at ¶¶ 42–43. Plaintiff alleges that she is "regularly reminded of the incident" because she "typically" travels by air more than once per month. *Id.* at ¶¶ 46–47.

Plaintiff's claims for false imprisonment and IIED should be dismissed for lack of subject-matter jurisdiction and failure to state a claim. First, both claims fail because the FTCA generally does not waive the United States' sovereign immunity for claims based on the intentional tortious conduct of federal employees, and the exception for certain torts committed by investigative or law enforcement officers does not apply to TSA screeners.

2

The Court therefore lacks subject-matter jurisdiction over the false imprisonment and IIED claims, and they should be dismissed pursuant to Rule 12(b)(1).

Second, even if the Court finds jurisdiction over Plaintiff's intentional tort claims, the IIED claim should still be dismissed for failure to state a claim under Oklahoma law, as the Complaint does not plausibly plead sufficient factual allegations to establish the required elements of the tort. In particular, the allegations are insufficient to state "extreme and outrageous" conduct or "severe" emotional distress as a matter of law. The IIED claim should therefore be dismissed pursuant to Rule 12(b)(6).

## II.     Statutory Framework

## A.     The Federal Tort Claims Act

The FTCA, enacted by Congress in 1946, waives the United States' sovereign immunity for money damages for certain torts committed by federal employees acting within the scope of their employment. 28 U.S.C. § 1346(b). Under the intentional tort exception, however, sovereign immunity is not waived for "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." *Id.* § 2680(h); *see also Millbrook v. United States*, 569 U.S. 50, 52 (2013).

In 1974, Congress—acting in response to a series of "no knock" raids conducted by federal narcotics officers—enacted a statutory exception to the intentional tort exception. *See* Pub. L. No. 93-253, § 2, 88 Stat. 50 (1974); *Pellegrino v. United States*, 937 F.3d 164, 194 (3d Cir. 2019) (Krause, J., dissenting) (discussing legislative history). That exception, commonly referred to as "the law enforcement proviso," waives immunity for claims arising out of "assault, battery, false imprisonment, false arrest, abuse of process, or malicious

prosecution" that are committed by "investigative or law enforcement officers of the United

States Government." 28 U.S.C. § 2680(h). The statute defines an "investigative or law

enforcement officer" to mean "any officer of the United States who is empowered by law to

execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.*

**B.     TSA and the Aviation and Transportation Security Act**

The Aviation and Transportation Security Act (ATSA), enacted after the terrorist

attacks of September 11, 2001, created the TSA and charged it with ensuring transportation

security, including civil aviation security. *See* Pub. L. No. 107-71, 115 Stat. 597 (2001). As

relevant here, Congress charged the TSA Administrator with "provid[ing] for the screening

of all passengers and property" on commercial passenger aircraft. 49 U.S.C. § 44901(a); *see

also id.* § 114(e)(1). To carry out this duty, the TSA Administrator is directed to "develop

standards for the hiring and retention of security screening personnel," "train and test

security screening personnel," and "be responsible for hiring and training personnel to

provide security screening." *Id.* § 114(e)(2)–(4).

TSA screeners "carry out administrative searches" at airport security checkpoints to

search for prohibited items on the person or property of air passengers prior to boarding.

*Vanderklok v. United States*, 868 F.3d 189, 208–09 (3d Cir. 2017). Although TSA screeners are

called "Transportation Security Officers" and wear badges as part of their uniforms, they do

not have the power to carry firearms, make arrests, or seize evidence. Declaration of Steven

Crawford (Crawford Decl.), ¶¶ 6, 9, attached as Exhibit 1.[2] They do not have any criminal

law enforcement powers, nor do they perform any criminal or civil law enforcement

---

[2] The Crawford Declaration was previously filed in support of the government Defendants'
Motion to Dismiss Plaintiff's prior lawsuit arising from the same events. *See Rhonda Mengert
v. TSA, et al.*, No. 4:19-cv-304, (Doc. 21-2) (N.D. Okla. filed Sep. 30, 2019).

function. *Id.* ¶¶ 6–12. Their highly circumscribed—but vital—role is to prevent items from being taken on commercial aircraft that could compromise the safety of passengers and crew and the public at large. *See United States v. Aukai*, 497 F.3d 955, 960 (9th Cir. 2007) (en banc). If screeners encounter a situation that calls for criminal investigative or enforcement activity, TSA directs that they request assistance from law enforcement personnel, who "will determine whether to take action under State or local laws." Civil Aviation Security Rules, 67 Fed. Reg. 8,340, 8,344 (Feb. 22, 2002); *see also* Crawford Decl., ¶ 10. The TSA Administrator is required to provide for at least one law enforcement officer at each security screening location. 49 U.S.C. § 44901(h)(2). Airports are separately required to have an adequate number of local law enforcement personnel on site. *See* 49 U.S.C. § 44903(c)(1); 49 C.F.R. § 1542.215.

## III.   Standards of Review

### A.   Standard for dismissal under Rule 12(b)(1)

Rule 12(b)(1) analysis concerns "'the very power of the district court'" to hear a claim. *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1201 (10th Cir. 2002) (quoting *Merritt v. Shuttle, Inc.*, 187 F.3d 263, 269 (2d Cir. 1999)). Federal courts are courts of limited jurisdiction and are empowered to act on claims against the United States or its agencies only in those specific instances when the Constitution or a statute unequivocally waives the federal government's sovereign immunity from suit. *Lane v. Pena*, 518 U.S. 187, 192 (1996); *Castenada v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994). The plaintiff bears the burden of establishing that subject-matter jurisdiction is proper. *Winnebago Tribe of Neb. v. Kline*, 297 F. Supp. 2d 1291, 1299 (D. Kan. 2004). When jurisdiction is challenged, the plaintiff bears the burden of showing why the case should not be dismissed. *Id.* The Court has wide discretion

to consider affidavits and other documents to resolve disputed jurisdictional facts, and reference to such evidence does not convert a motion to dismiss into a motion for summary judgment. *Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1296 (10th Cir. 2003) (citations omitted).

### B.       Standard for dismissal under Rule 12(b)(6)

Rule 12(b)(6) analysis requires courts to determine whether the complaint is legally and factually sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–80 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* at 678 (quotations omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotations omitted). The standard requires "enough facts to state a claim to relief that is plausible on its face," and not merely "speculative." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (citations omitted). The Court must accept all well-pleaded, non-conclusory allegations as true and construe them in the light most favorable to the plaintiff. *Id.* at 555. However, the Court "need not accept mere conclusions characterizing pleaded facts or 'unwarranted inferences drawn from the facts or footless conclusions of law predicated upon them.'" *Torres v. Pueblo Bd. of Cnty. Comm'rs*, 229 F.3d 1165, 2000 WL 1346347, at *1 (10th Cir. 2000) (quoting *Bryson v. City of Edmond*, 905 F.2d 1386, 1390 (10th Cir. 1990)).

### IV.    <u>Argument</u>

### A.       The Court lacks subject-matter jurisdiction over Plaintiff's claims.

The intentional torts exception to the FTCA excludes from the statute's waiver of sovereign immunity claims arising out of enumerated intentional torts, including false imprisonment. 28 U.S.C. § 2680(h). An exception to that exclusion, the law enforcement

proviso, waives sovereign immunity for claims based on the conduct of investigative or law enforcement officers. That exception does not save Plaintiff's claims here. The plain text of the law enforcement proviso establishes that it applies only to intentional torts committed by traditional investigative or law enforcement officers, *not* by TSA security screeners conducting administrative searches. That interpretation is confirmed by the proviso's legislative history, which demonstrates that Congress did not intend for it to reach any federal employee who conducts any type of search, as well as the statute authorizing the TSA Administrator to ensure security screening. And even if a contrary construction were plausible, any ambiguity should be construed narrowly because Congress did not clearly signal an intent to waive sovereign immunity for claims of intentional torts such as false imprisonment arising out of TSA screeners' typical daily search of over two million passengers and crew.[3] Therefore, Plaintiff's intentional tort claims should be dismissed for lack of subject-matter jurisdiction under 28 U.S.C. § 2680(h).

> **1.** **The plain language of the law enforcement proviso shows that TSA security screeners are not "investigative or law enforcement officers."**

In applying the FTCA's law enforcement proviso, the Court must "look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). Statutory terms should not be construed "in a vacuum, but with reference to the statutory context, structure, history, and purpose." *Abramski v. United States*, 573 U.S. 169, 179 (2014) (quotations omitted). Here,

---

[3] Prior to the COVID-19 pandemic, TSA screened an average of between 2 to 2.5 million individuals per day. In recent months, TSA has once again regularly screened more than 2 million individuals per day. *See* TSA Website, available at: https://www.tsa.gov/news/press/releases/2021/06/12/tsa-surpasses-2-million-daily-travelers-screened.

there are multiple indicators in the statutory text that show it is intended to apply only to traditional law enforcement officers empowered to investigate and respond to suspected criminal conduct.

First, Congress limited the proviso to "investigative or law enforcement officers," rather than "employees." Elsewhere in 28 U.S.C. § 2680, in contrast, Congress created exceptions to the FTCA's waiver of sovereign immunity for certain claims arising out of the "act or omission of an employee of the Government." 28 U.S.C. § 2680(a), (e). Where Congress uses certain language in one statutory provision but not another, that choice should be given significance. *See Loughrin v. United States*, 573 U.S. 351, 358 (2014). And Congress's use of "investigative or law enforcement officer" in the proviso carries further significance, as Congress used that same phrase elsewhere in the U.S. Code to describe individuals authorized by law to perform traditional criminal law enforcement functions. *See, e.g.*, 18 U.S.C. § 2510(7) (describing an officer "empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offenses"); 50 U.S.C. § 1809 (criminalizing electronic surveillance under color of law, but establishing the defense "that the defendant was a law enforcement or investigative officer engaged in the course of his official duties and the electronic surveillance was authorized by and conducted pursuant to a search warrant or court order").

Second, Congress expressly defined "investigative or law enforcement officer" to mean an officer "empowered by law to execute searches, to seize evidence or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). Even viewed in isolation, the authority to "execute searches" naturally connotes the traditional police power to execute a warrant or

other type of criminal search, such as a search incident to arrest. *See, e.g.*, *United States v. Ramirez*, 523 U.S. 65, 69 (1998) ("[A]pproximately 45 officers gathered to execute the [search] warrant."); *Los Angeles County v. Rettele*, 550 U.S. 609, 614 (2007) ("In executing a search warrant officers may take reasonable action to secure the premises."). Notably, Congress used the term "execute" rather than more general language such as "conduct" or "carry out." In contrast, where Congress has described administrative searches of the type carried out by TSA screeners—searches conducted without individualized suspicion for a particular purpose other than criminal investigation—it has typically used terms such as "screening" or "inspection." *See* 29 U.S.C. § 657(a)(2) (OSHA inspectors may "inspect and investigate"); 21 U.S.C. § 374(a)(1) (FDA inspectors may "enter" and inspect"); 42 U.S.C. § 6927(a) (authorizing EPA inspectors "to enter" and "to inspect").

Third, the other listed powers in the proviso's definition of investigative or law enforcement officer—to "seize evidence" and "to make arrests"—confirm that "execute searches" should be read narrowly. Those powers are quintessential police powers. Under the interpretive principle that words in a list should be read together and given a related meaning—*i.e.*, that a "word is known by the company it keeps"—"seize evidence" and "make arrests" suggest that "execute searches" should be read to be limited to traditional law enforcement searches. *See Dolan v. U.S. Post. Serv.*, 546 U.S. 481, 486–87 (2006). In *Dolan*, the Supreme Court, in interpreting the statutory exception to the FTCA's waiver of sovereign immunity for claims "arising out of the loss, miscarriage, or negligent transmission of letters or postal matter," 28 U.S.C. § 2680(b), refused to consider the phrase "negligent transmission" "in isolation . . . [to] embrace a wide range of negligent acts committed by the Postal Service in the course of delivering mail," instead reading it in

9

relation to "loss" and "miscarriage" as limited to "negligence causing mail to be lost or to arrive late, in damaged condition, or at the wrong address." *Id.* at 486. A similar analysis applies here and supports an interpretation of "execute searches" to mean only traditional criminal law enforcement searches. *See, e.g.*, *Hernandez v. United States*, 34 F. Supp. 3d 1168, 1179 (D. Colo. 2014) ("[W]hen considered within the broader context of the 'law enforcement' proviso, the phrase 'to execute searches' does not contemplate the type of searches performed by TSA screeners.").[4]

Fourth, the list of duties carried out by "investigative or law enforcement officers"—"to execute searches, to seize evidence, or to make arrests"—is further qualified by the requirement that the search, seizure, or arrest is "for violations of Federal law." An investigative or law enforcement officer may only make an arrest for a violation of federal law that is criminal in nature. That plain meaning should inform the construction of the first two items of the list to similarly refer to traditional criminal law enforcement. Furthermore, the phrase "for violations of Federal law" is best read to apply to all three similar items in the integrated list. *See Clark v. Martinez*, 543 U.S. 371, 378 (2005) (a phrase that "applies without differentiation to all three categories" retains the same meaning when modifying each category). The security screenings carried out by TSA screeners are not for the purpose of determining whether a violation of federal law has been committed or gathering evidence of such a violation. *See Pellegrino*, 937 F.3d at 184 (Krause, J., dissenting) ("[S]uch

---

[4] The Tenth Circuit has not addressed the application of 28 U.S.C. § 2680(h) to TSA's screening workforce. Only two district courts from within the Circuit have decided the issue, and both held that TSA screeners are not "investigative or law enforcement officers within the meaning" of the FTCA. *Hernandez*, 34 F. Supp. 3d 1168 (Babcock, J.); *Frey v. Town of Jackson*, No. 19-cv-50, (Doc. 89 at 47–48) (D. Wyo. Dec. 2, 2019) (Freudenthal, J.). This Court should follow the persuasive reasoning in *Hernandez* and *Frey*.

suspicionless screenings are not implemented to gather evidence of a crime with an eye toward criminal prosecution[.]"); Crawford Decl., ¶ 9 ("[N]o TSA screener at TUL is authorized to . . . execute a criminal investigative search.").[5] Rather, an airport screening is an administrative search that is carried out without the need for individualized suspicion or probable cause. *See, e.g.*, *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 675 n.3 (1989); *Aukai*, 497 F.3d at 960 (explaining that "airport screening searches . . . are conducted . . . in furtherance of an administrative purpose"). Indeed, aviation security screenings by TSA screeners would be unconstitutional if their primary purpose were to detect evidence of ordinary criminal wrongdoing.[6] *See City of Indianapolis v. Edmond*, 531 U.S. 32, 41–43 (2000). The modifier "for violations of Federal law" should not be construed to mean criminal violations when modifying the power to make arrests, but to mean criminal *and civil* violations when modifying the power to execute searches.

Finally, it is notable that the specific intentional torts that are covered by the law enforcement proviso—assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution—are the types of torts typically committed by individuals with traditional police powers. Taken as a whole, the statutory language makes clear that the

---

[5] In ruling on a motion to dismiss for lack of subject-matter jurisdiction, the Court may properly consider affidavits and evidence such as official job descriptions to determine whether particular federal employees are investigative or law enforcement officers under § 2680(h). *See, e.g.*, *Vaupel v. United States*, 491 F. App'x 869, 872 (10th Cir. 2012); *Carrero v. Farrelly*, No. 16-cv-3939, 2018 WL 1761957, at *5 n.2 (D. Md. Apr. 12, 2018) (explaining that consideration of extrinsic evidence was appropriate in determining whether an ICE employee who entered information into the National Crime Information Center database was an investigative or law enforcement officer); *Chisholm v. United States*, No. 08-cv-4149, 2009 WL 10710968, at *2-3 (D.S.C. Nov. 10, 2009) (considering deposition testimony and governing procedures explaining the scope of an employee's authority).
[6] TSA screeners must call for assistance from law enforcement officers whenever they believe there may be a need for investigation or criminal enforcement intervention. Crawford Decl., ¶ 10.

proviso is best understood to permit only claims arising out of the conduct of officers empowered with traditional criminal investigative and law enforcement functions.

2.    **The legislative history of the proviso confirms its narrow scope.**

Although the plain language of the law enforcement proviso is clear that Congress did not intend for it to apply to any federal employee conducting a search, that conclusion is also supported by its legislative history, which demonstrates that Congress intended to limit the proviso to federal law enforcement officers empowered to perform criminal investigatory duties.

The law enforcement proviso was enacted following a series of no-knock, warrantless searches of houses that federal and state narcotics officers mistakenly believed were locations for drug dealing. John C. Boger, Mark Gitenstein & Paul R. Verkuil, *The Federal Tort Claims Act Intentional Torts Amendment: An Interpretative Analysis*, 54 N.C. L. REV. 497, 500 (1976). The occupants testified before Congress that plain-clothed officers broke into their homes, pointed guns at them, and caused extensive damage. *Id.* at 500–01, 500 n.7. The press reported that the same law enforcement officers had been involved in earlier, mistaken searches that had caused substantial injury. *Id.* at 502–03. Following hearings, Congress enacted the law enforcement proviso in its current form.

Before enacting the proviso, Congress considered three separate bills that would have amended the broad immunity conferred by the FTCA's intentional tort exception. Two of the bills waived sovereign immunity for torts committed by *all* federal employees. *See* 54 N.C. L. REV. at 510–17. The bill that became the law enforcement proviso, in contrast, was limited to torts committed by "investigative or law enforcement officers." Members of Congress and the Executive Branch repeatedly noted that the proviso bill "only applies to

12

law enforcement officers. It does not apply to any other Federal employees that might violate the rights of an individual." 120 Cong. Rec. 5287 (statements of Reps. Donohue and Wiggins); *see also* Federal Tort Claims Amendments: Hearings on H.R. 10439 Before the Subcomm. on Claims and Governmental Relations of the H. Judiciary Comm., 93d Cong. 18 (1974) (testimony of Irving Jaffe, Acting Assistant Att'y Gen.) ("We have Department of Agriculture investigators who go look at books and records. We have Defense Department auditors to look at books and records. . . . They are not law enforcement officers" under the definition in the bill enacted into law); Sen. Rep. No. 93-588 (1974) (the purpose of the law enforcement proviso was to provide a remedy for "innocent individuals who are subjected to raids of the type conducted in Collinsville, Illinois"). This history confirms that Congress did not intend the proviso to apply to every federal employee who might have authority to conduct some type of search, but rather intended the proviso to apply only to federal law enforcement officers empowered to perform criminal investigatory duties.

### 3. ATSA confirms that TSA screeners are not empowered by law to execute searches, to seize evidence, or to arrest.

The law enforcement proviso requires that an "officer" must be "empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal Law." 28 U.S.C. § 2680(h). Determining whether the proviso applies, therefore, requires examining the powers granted by law to the officer. *See Millbrook*, 569 U.S. at 56. Here, the relevant laws governing aviation security screening make clear that TSA screeners are not granted the powers listed in § 2680(h)—in sharp distinction from a separate class of law enforcement officers who are.

The ATSA directs the TSA Administrator to "provide for the screening of all passengers and property." 49 U.S.C. § 44901(a). The TSA Administrator performs that function by

hiring and training "security screening personnel," *id.* § 114(e) (or by entering into a contract with a qualified private security company, *id.* §§ 44901(a), 44920). But the ATSA does not grant those screening personnel any law enforcement powers to execute searches, seize evidence, and make arrests.

In contrast, the TSA Administrator can designate a federal employee "to serve as a law enforcement officer." *Id.* § 114(p)(1). A designated law enforcement officer is then granted the "[p]owers" under § 114(p)(2) to "carry a firearm"; "make an arrest" for federal offenses; and "seek and execute warrants for arrest or seizure of evidence . . . upon probable cause that a violation has been committed." TSA law enforcement officers serve, for example, as federal air marshals, deployed undercover on aircraft to protect passengers and crew against the risk of criminal and terrorist violence. That is the type of "investigative or law enforcement officer" that Congress intended to come within the scope of the law enforcement proviso. TSA security screeners, in contrast, are not.

In light of ATSA's bifurcation of screening authority and law enforcement authority, this Court should follow others that have embraced the commonsense understanding that the scope of the phrase "investigative or law enforcement officer" is meant to include only "the likes of FBI agents, Bureau of Prisons officers, postal inspectors, and [immigration enforcement] agents, all of which" perform "traditional law enforcement functions" and have "broad search, seizure, and/or arrest powers that they may exercise in a variety of circumstances." *Weinraub v. United States*, 927 F. Supp. 2d 258, 262–63 (E.D.N.C. 2012); *see also Pellegrino*, 937 F.3d at 198–99 (Krause, J., dissenting). Unlike the law enforcement officers whose abusive conduct triggered enactment of the law enforcement proviso, TSA screeners do not conduct criminal investigations, search homes, or have weapons to draw.

14

They are not authorized to exert force in furtherance of TSA's screening mission,[7] and they perform their duties only at designated airport checkpoints where individuals are subject to an administrative search because they have chosen to enter the sterile area of the airport. *See Corbett v. TSA*, 767 F.3d 1171, 1182 (11th Cir. 2014) ("Airport screening is a permissible administrative search; security officers search all passengers, abuse is unlikely because of its public nature, and passengers elect to travel by air knowing that they must undergo a search.").

### 4. Any ambiguity regarding the scope of the law enforcement proviso should be resolved narrowly in favor of sovereign immunity.

Finally, even if it were possible to read the language in the proviso in isolation, and out of context, to cover any federal employee who might be empowered to carry out some type of search, that should not be a sufficient basis to abrogate the United States' sovereign immunity in the absence of a clear statement that Congress intended such a result. A congressional waiver of sovereign immunity is strictly construed in favor of the government, and "[a]ny ambiguities in the statutory language are to be construed in favor of immunity." *FAA v. Cooper*, 566 U.S. 284, 290–91 (2012).

Adhering to that axiom is especially important in the factual context in which Plaintiff's claim arises. Airport screening necessarily involves intentional conduct by TSA screeners that an airline passenger might find objectionable. For example, screeners may intentionally instruct a passenger to remain standing in a particular area of the checkpoint until a screening procedure can be completed. In addition, screening may entail a certain degree of intentional physical contact in order to ensure that no security threat is present. Under the

---

[7] TSA does not, however, prohibit TSA screeners from defending themselves or others in order to stop a physical assault.

FTCA, a passenger may bring a claim for up to two years after a security screening experience (long after the typical period in which surveillance video of that screening is typically retained). Given that TSA screeners typically interact with more than two million passengers per day, *supra* n.3, opening the FTCA to such an expansive new realm of interaction entails substantial resource allocation issues that Congress is best positioned to address in the first instance.

> **5.    The better-reasoned decisions by other courts support the conclusion that TSA screeners are not "investigative or law enforcement officers" within the meaning of the law enforcement proviso.**

As shown above, the text, context, and history of the law enforcement proviso demonstrate that it does not apply to TSA employees conducting airport security screening. Although courts have not reached uniform results on this issue, the better-reasoned and more persuasive authority supports the conclusion that TSA screeners are not "investigative or law enforcement officers" for purposes of 28 U.S.C. § 2680(h).

The first court of appeals to reach the question, the Eleventh Circuit, concluded unanimously that TSA screeners do not qualify as law enforcement officers for the purposes of the FTCA's law enforcement proviso. *See Corbett v. TSA*, 568 F. App'x 690, 700–02 (11th Cir. 2014), *cert. denied*, 135 S. Ct. 1559 (2015). The Eleventh Circuit reasoned that TSA screeners "are not 'officers of the United States Government,' as required by § 2680(h)'s statutory language." *Id.* at 701. The Court pointed to the distinction drawn in the FTCA between an "employee" of the federal government and an "officer of the United States," and reasoned that "[t]his variation in language is not insignificant." *Id.* The Court further emphasized that "the federal statutes governing airport security screening differentiate between federal employees of TSA and law enforcement officers," and that only the latter

16

are the types of officers covered by § 2680(h). *Id.* (comparing 49 U.S.C. § 44901, which provides that "screening . . . shall be carried out by a Federal Government employee," with 49 U.S.C. § 114(p), which empowers the TSA Administrator to designate employees as "law enforcement officers" with the authority to carry a firearm, make arrests, and seek and execute search and arrest warrants").

Although a divided en banc Third Circuit reached the opposite conclusion in *Pellegrino v. United States*, 937 F.3d 164 (3d Cir. 2019), the dissenting opinion in that case, authored by Judge Krause and joined by Judges Jordan, Hardiman, and Scirica, more completely and naturally harmonizes both the terms of the statute and the applicable case law. The dissenting judges exhaustively analyzed the language of the law enforcement proviso, viewed in light of the longstanding distinctions between investigatory law enforcement searches and administrative searches, as well as its legislative history. *Id.* at 182–96. The dissent also pointed to the sweeping ramifications of the majority's holding, which the dissenters concluded would "naturally result in the waiver of sovereign immunity for all employees who perform administrative searches." *Id.* at 196–98. That majority opinion not only created a circuit split with the Eleventh Circuit, the dissent noted, but was at odds with the overwhelming weight of circuit authority involving other types of employees who did not enforce federal criminal laws. *Id.* at 197–200.[8] As the dissent explained, the majority

---

[8] The dissent's analytical approach is also in keeping with how courts have understood and applied the proviso to a variety of federal employees who lack traditional criminal law enforcement authority. Courts have held that certain employees do not qualify as investigative or law enforcement officers despite being empowered to engage in activities constituting a Fourth Amendment search or seizure. *See, e.g.*, *Wilson v. United States*, 959 F.2d 12, 15 (2d Cir. 1992) (federal parole officers); *Martin v. United States*, No. 15-cv-278, 2016 WL 4542289, at *4-6 (S.D. Cal. Aug. 31, 2016) (FAA operations inspector); *Lorsch v. United States*, No. 14-cv-2202, 2015 WL 6673464, at *11 (C.D. Cal. Oct. 29, 2015) (Veterinary Medical Officers and Animal Care Inspectors); *Garrett's Worldwide Enters., LLC*

opinion "dissects the law enforcement proviso into individual words and isolated phrases—text without context—and picks the broadest conceivable definition of each word." *Id.* at 181. "That breathtaking expansion of the proviso is textually unsound, departs from other circuits, and contravenes the rule that waivers of sovereign immunity must be strictly construed in favor of the Government." *Id.* And even if the majority's interpretation of the law enforcement proviso was "plausible," that was insufficient to support the majority's ruling because "a waiver of sovereign immunity must be unequivocally expressed in statutory text, and any ambiguities in the statutory language are to be construed in favor of immunity." *Id.* (citation and internal quotation marks omitted).

Indeed, even the majority in *Pellegrino* sought to cabin the reach of its holding by distinguishing the screening conducted by TSA screeners from what it called "typical administrative searches," emphasizing the "physically intrusive and ubiquitous nature of TSA searches." *Id.* at 176. But as the dissenters correctly recognized, "this reading of the proviso as limited to 'physical searches' [is not only] atextual, it is made out of whole cloth." *Id.* at 195. The better reading of the proviso is the one advanced by the *Pellegrino* dissenters, which is grounded in statutory text, context, and history. And consistent with that view, the overwhelming majority of the district courts that have decided this issue—including the only two courts within the Tenth Circuit to consider the question, *see supra*

---

*v. United States*, No. 14-cv-2281, 2015 WL 11825762, at *5 (D. Kan. Mar. 16, 2015) (Department of Transportation inspectors who had badges and investigation powers); *Chisholm*, 2009 WL 10710968 (loss prevention associate at military base exchange who followed customer suspected of shoplifting and brought her back to the store to be questioned and searched); *Robinson v. United States*, No. 07-cv-1496, 2008 WL 11509485 (D. Md. Mar. 18, 2008) (workplace supervisor who searched subordinate's cubicle); *Saratoga Sav. & Loan Ass'n v. Fed. Home Loan Bank of San Francisco*, 724 F. Supp. 683, 689 (N.D. Cal. 1989) (Federal Savings and Loan Insurance Corporation examiners empowered to access and take documentary records from financial institutions for enforcement purposes).

18

n.4—have concluded that TSA screeners are not investigative or law enforcement officers for purposes of the FTCA.[9]

Most recently, a divided panel of the Eight Circuit followed the *Pellegrino* majority and held that "given the powers delegated to [TSA screeners] and the highly intrusive search techniques they are authorized to use, we find that they fall within the ordinary public meaning of the proviso's definition of investigative or law enforcement officers." *Iverson v. United States*, 973 F.3d 843, 854 (8th Cir. 2020). But again, the dissenting opinion, authored by Judge Gruender, provides the more persuasive analysis. Agreeing with the *Pellegrino* dissenters and the weight of district court authority, Judge Gruender found that TSA screeners are not "investigative or law enforcement officers" within the meaning of the FTCA for several reasons: they are "specifically deemed 'employees' and not 'officers' in the relevant authorizing statute" and therefore "they are not 'officer[s] of the United States' as defined in the FTCA"; in context, "it is clear that the FTCA waives sovereign immunity only for intentional torts committed by officers who execute searches for violations of federal criminal law"; and "the closeness of this issue dictates that TSA screeners" must be deemed outside of the scope of the law enforcement proviso under the "general rule that waivers of sovereign immunity are to be strictly construed" in favor of the Government. 973 F.3d at 855–68 (Gruender, J., dissenting).[10]

---

[9] *See e.g.*, *Gesty v. United States*, 400 F. Supp. 3d 859 (D. Ariz. Jul. 19, 2019), *aff'd on reconsideration*, No. 18-cv-533, (Doc. 33) (D. Ariz. Oct. 23, 2019) (explaining that the intervening *Pellegrino* decision "does not change [this] Court's analysis or determination"); *Weinraub*, 927 F. Supp. 2d 258.

[10] The issue was also presented to the Second Circuit last year, but that court declined to resolve it, instead remanding to the district court for further fact discovery on whether the TSA employee at issue "was a screener or a law enforcement officer within the meaning of federal airport security laws." *Leytman v. United States*, No. 18-3859, 2020 WL 1487681, at *2 (2d Cir. Mar. 25, 2020). No such discovery is necessary here, as it is undisputed that the

In sum, TSA screeners who only conduct limited administrative searches for prohibited items on the person or in the property of airline passengers are not officers empowered to execute searches for violations of federal law within the meaning of the law enforcement proviso. Thus, Congress has not waived the United States' sovereign immunity for claims arising from the intentional torts listed in the proviso—including false imprisonment— committed by TSA screeners.

### 6.     The IIED claim arises out of allegations of false imprisonment.

Although Plaintiff pleads a nominally distinct claim for IIED in addition to her claim for false imprisonment, the IIED claim arises out of, and indeed depends on, the same factual allegations underlying the false imprisonment claim. The intentional tort exception set forth in 28 U.S.C. § 2680(h) bars not only claims for the expressly listed torts—e.g., "false imprisonment"—but also *any* claim arising out of alleged conduct constituting those torts. *United States v. Shearer*, 473 U.S. 52, 55 (1985) ("Section 2680(h) does not merely bar claims *for* assault and battery; in sweeping language it excludes any claim *arising out of* assault or battery."); *see also Harms v. United States*, 972 F.2d 339, 1992 WL 203942, at *4-5 (4th Cir. Aug. 24, 1992) (unpublished table decision) (holding that even though IIED claim was not "expressly barred by section 2680(h)," it was "dependent upon" allegations of conduct constituting the expressly listed intentional torts of libel and slander). Thus, regardless of how a plaintiff chooses to label a claim, the claim is barred if it is fundamentally predicated on alleged conduct that is essential to one of the listed torts. *See, e.g., Blackburn v. United States*, No. 20-8005, 2021 WL 3027979, at *4–5 (10th Cir. Jul. 19,

---

federal employee who allegedly committed IIED is a TSA screener who has not been designated to serve as a law enforcement officer. Crawford Decl., ¶¶ 13–14.

2021) (explaining that the intentional tort exception covers claims that sound in negligence but stem from an intentional tort committed by a government employee); *Popovic v. United States*, 175 F.3d 1015, 1999 WL 228243, at *3 (4th Cir. Apr. 20, 1999) (unpublished table decision) ("It is well settled that the form of the tort does not control; we must look to the substance of the conduct of which the plaintiff complains." (citations omitted)).

Here, Plaintiff's IIED claim depends on factual allegations she relies upon to plead her claim for false imprisonment. She alleges that she suffered emotional distress when TSA screeners "order[ed]" and "forced" her to go to a private screening room "and expose her most intimate areas to them." (Doc. 2 at ¶¶ 57, 62, 66). Plaintiff further alleges that she was "illegally" "detained without her consent" throughout those events, and "her compliance was required" by virtue of the fact of her detention. *Id.* at ¶¶ 66, 57, 35. The essential substance of those factual allegations is a claim for false imprisonment. Plaintiff's attempt to plead a distinct claim for IIED is clearly dependent upon the allegations of unlawful detention. As alleged in the Complaint, the TSA screeners were only able to inflict emotional distress on Plaintiff *because* of their position as "employee[s] of the government" giving orders to a detained "private citizen." *Id.* at ¶ 66. Isolated from that context in which the screeners' authority purportedly "forced" Plaintiff to comply, *id.* at ¶ 62, the Complaint merely alleges two people giving offensive "directions" to a third person, which the third person could simply ignore, *id.* at ¶ 63. To overcome this, Count 2 pleading the IIED claim necessarily asserts that what makes the alleged conduct "extreme and outrageous" is the fact that it was committed by "employee[s] of the government" who were acting "illegally" to detain a citizen. *Id.* at ¶ 66. "No semantical recasting of events can alter the fact that" the allegedly unlawful, nonconsensual detention was the essential cause of the claimed injury to

21

Plaintiff and therefore the true basis of the FTCA claim in this action. *Shearer*, 473 U.S. at

55. Plaintiff "cannot avoid the reach of § 2680(h) by framing" in different terms what is at

bottom a claim predicated on allegations of the expressly barred tort of false imprisonment.

*Id.*; *see also Sheppard v. United States*, 537 F. Supp. 2d 785, 788 (D. Md. 2008) ("[I]f the

substance of plaintiff's claim falls within the rubric of false imprisonment, then the Court

lacks subject-matter jurisdiction[.]" (quotation omitted)).

Because Plaintiff's IIED claim arises out of an alleged false imprisonment—a tort listed

in 28 U.S.C. § 2680(h)—the Court lacks subject-matter jurisdiction to hear the claim unless

it is based on the alleged conduct of an investigative or law enforcement officer. As

explained above, TSA screeners are not investigative or law enforcement officers within the

meaning of the FTCA's law enforcement proviso. Accordingly, the Court should dismiss

the IIED claim pursuant to Rule 12(b)(1).

## B.      Plaintiff fails to state a claim for IIED.

Even if the Court finds jurisdiction over Plaintiff's IIED claim, it remains subject to

dismissal for failure to state a claim. The factual allegations pled in the Complaint are

insufficient to plausibly establish the required elements of IIED under Oklahoma law.[11]

Specifically, the allegations are insufficient to state "extreme and outrageous" conduct or

"severe" emotional distress as a matter of law. *Ridings v Maze*, 414 P.3d 835, 839 (Okla.

2018).

To state a plausible claim for IIED under Oklahoma law, "a plaintiff must allege that

'(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme

---

[11] Under the FTCA, the law of the place where the allegedly tortious acts or omissions
occurred governs tort claims asserted against the United States. 28 U.S.C. § 1346(b)(1);
*Richards v. United States*, 369 U.S. 1 (1962).

and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe.'" *Romero v. City of Miami*, 8 F. Supp. 3d 1321, 1334 (N.D. Okla. 2014) (quoting *Schovanec v. Archdiocese of Okla. City*, 188 P.3d 158, 175 (Okla. 2008)). The sufficiency of a plaintiff's allegations is judged "by the narrow standards laid out in the Restatement Second of Torts, § 46." *Id.* (citing *Gaylord Entm't Co. v. Thompson*, 958 P.2d 128, 149 (Okla. 1998)). In this case, Plaintiff's allegations do not meet the Restatement standards with regard to the second and fourth elements required to state a claim—extreme and outrageous conduct and severe emotional distress.

"Under Oklahoma law, the trial court must assume a gatekeeper role" with regard to whether alleged conduct is sufficiently extreme and outrageous. *Id.* (quotation omitted). The Court should dismiss an IIED claim when the alleged conduct is not "so outrageous in character, *and* so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1376 (Okla. 1978) (emphasis added). When the allegations in a complaint amount to no more than mere "indignities, threats, annoyances, [and] petty oppressions," they are not sufficient to state a claim for IIED. *Id.* "The level of offense necessary to prove an IIED claim—that the conduct be 'so extreme in degree, as to go beyond all possible bounds of decency'—constitutes, by its own terms, a very high burden" for a plaintiff to satisfy in pleading a complaint. *Romero*, 8 F. Supp. 3d at 1334. Alleged "[c]onduct could reasonably be viewed as highly offensive while still not rising to the level of extreme and outrageous." *Id.*

In this case, it is clear that the alleged conduct of TSA employees was not extreme and outrageous as a matter of law. Plaintiff alleges that, after an alarm during AIT screening

indicated the presence of an item in her groin area and TSA employees could not confirm

during a pat-down that the item was safe for air travel,[12] she was asked to remove the item in

a private screening room in the presence of two other members of her gender. (Doc. 2 at ¶¶

29–33). She further alleges that she was asked to show the female TSA employees the item

"for their visual inspection." *Id.* at ¶ 33. And she alleges that after her screening was

complete, she had to ask four times before she was allowed to leave the private screening

room. *Id.* at ¶¶ 37–38. Those alleged events simply do not rise to the level of extreme and

outrageous conduct required to state a claim for IIED. Even if the female TSA employees

were wrong in asking Plaintiff to remove the item and show it to them, Plaintiff's brief

exposure of her body to their view in a private setting is not something that is outrageously

outside the bounds of society. Indeed, such brief exposures are a routine part of American

society in gender segregated communal spaces such as locker rooms at workplaces, schools,

and public pools. Given the prevalence of such spaces, where individuals are typically seen

by other members of their gender in states of partial undress, any privacy intrusion Plaintiff

experienced was clearly not "so extreme in degree" as to be "utterly intolerable in a civilized

---

[12] Courts have "had little trouble concluding that the substantial danger to life and property that could result from airplane terrorism outweigh[s] the possible intrusion of TSA's AIT and pat-down screening procedures on airline passengers." *Corbett v. TSA*, 930 F.3d 1225, 1227 (11th Cir. 2019). We live "[i]n a world where air passenger safety must contend with such nuanced threats as attempts to convert underwear into bombs." *George v. Rehiel*, 738 F. 3d 562, 578 (3d Cir. 2013); *see also Corbett*, 767 F.3d at 1180 ("For example, on December 25, 2009, a terrorist attempted to detonate a nonmetallic explosive device hidden in his underwear while aboard an American aircraft flying over the United States, for which Al Qaeda claimed credit."). While Plaintiff and others who are not transportation security professionals may not grasp the critical importance of fully resolving an AIT alarm in the groin area even when doing so entails some intrusion on passenger privacy, the Court should not overlook the need to ensure that screening is sufficiently thorough in light of modern threats. *See United States v. McCarty*, 648 F.3d 820, 825 (9th Cir. 2011) (noting that "thin, flat explosives called 'sheet explosives' may be disguised as a simple piece of paper or cardboard, and may be hidden in just about anything").

community," *Breeden*, 575 P.2d at 1376. *See Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1558 (10th Cir. 1995) ("Nothing short of *extraordinary* transgressions of the bounds of civility will give rise to liability for [IIED]." (quotation omitted)).

Plaintiff's allegation that the TSA employees "ignored" her requests to leave "without any reason apparent" until she had asked four times, (Doc. 2 at ¶¶ 37–38), also does not suffice to elevate her screening experience into something extreme and outrageous. *See, e.g.*, *Young v. City of Idabel*, 721 F. App'x 789, 805 (10th Cir. 2018) (applying Oklahoma law and noting that "rude or hostile treatment" without more "is not enough to meet the IIED standard"); *Starr*, 54 F.3d at 1559 (noting the "bounds between what is merely rude and objectionable and what is actionable"); *Miller v. Miller*, 956 P.2d 887, 901 (Okla. 1998) ("The test [for IIED] is whether the alleged tortfeasor's conduct is simply one of those unpleasant examples of human behavior which we all must endure from time to time, or whether it has so totally and completely exceeded the bounds of acceptable social interaction that the law must provide redress."); *Eddy v. Brown*, 715 P.2d 74, 77 (Okla. 1986) ("Not every . . . offensive verbal encounter may be converted into a tort[.]"). In sum, even if Plaintiff's screening experience "could be considered highly offensive to a reasonable person," that is not enough to support an IIED claim. *Romero*, 8 F. Supp. 3d at 1334. The standard for pleading an IIED claim is more "onerous," and the allegations in the Complaint here are insufficient to meet it. *Id.*

Importantly, whether the TSA employees' alleged conduct violated the Fourth Amendment or any other applicable law or policy is a separate inquiry from determining if the conduct rose to the "extreme and outrageous" level required to state a claim for IIED. *See Pebsworth v. Spirit AeroSystems, Inc.*, No. 16-cv-644, 2018 WL 1569496, at *4 (N.D. Okla.

Mar. 30, 2018) ("[A]lleged law violations, even physical violations such as assault and battery, do not automatically trigger liability for IIED."). For example, in *Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003), the Tenth Circuit considered Fourth Amendment and IIED claims based on the same set of facts and held that the constitutional claim could proceed but the tort claim could not. The *Dubbs* plaintiffs complained that their "pre-school children enrolled in the Head Start program in Tulsa . . . were subjected to intrusive physical examinations, including genital examinations and blood tests, on school premises without parental notice or consent." *Id.* at 1197. The district court granted summary judgment in favor of the defendants on both the plaintiffs' Fourth Amendment claim and IIED claim under Oklahoma law. With respect to the constitutional claim, the Court of Appeals reversed the district court, finding that a violation of the Fourth Amendment would be established if the plaintiffs proved at trial that they did not consent to the physical exams of their children. *Id.* at 1207-12. With respect to the IIED claim, however, the Court of Appeals affirmed the district court's holding that the defendants' conduct in performing the physical exams did not "rise to the level of extreme outrageousness required for liability on a claim of [IIED]" regardless of whether the plaintiff parents could prove that they did not consent to the exams. *Id.* at 1218.

Comparing this case to *Dubbs*, it is clear that Plaintiff's allegations here are not sufficient to state a claim for IIED. *See Zeran v. Diamond Broadcasting*, 203 F.3d 714, 721 (10th Cir. 2000) (evaluating whether alleged conduct was extreme and outrageous through comparison "to the kinds of conduct that have sustained IIED claims" in other cases). In *Dubbs*, the challenged search procedures involved touching exposed genitals and blood testing of pre-school children, allegedly without their parents' consent. Despite the obvious

26

gravity of the defendants' conduct in searching the children, the Court of Appeals held that it was not extreme enough to support an IIED claim. Plaintiff's alleged screening experience in this case was far less invasive and offensive. Accordingly, her IIED claim should be dismissed.

Plaintiff's Complaint also fails to state sufficient factual allegations to establish that she suffered truly "severe" emotional distress. *See Zeran*, 203 F.3d at 721 ("It is also the trial court's initial responsibility to determine whether the distress allegedly suffered by the plaintiff is severe emotional distress.") (citation omitted); *Wheeler v. Spirit AeroSystems, Inc.*, No. 13-cv-421, 2013 WL 5520012, at *5 (N.D. Okla. Oct. 1, 2013) ("The Court is to make a . . . threshold determination with regard to the fourth prong, the presence of severe emotional distress."). As with the standard for pleading extreme and outrageous conduct, stating sufficient factual allegations to establish "severe" distress is also "a high bar to clear." *Young*, 721 F. App'x at 805. To state a claim for IIED, a plaintiff's complaint must allege distress "of such a character that 'no reasonable person could be expected to endure it.'" *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1389 (10th Cir. 1991) (applying Oklahoma law and quoting Restatement (Second) of Torts § 46, cmt. j). "[F]ederal courts in Oklahoma considering" the sufficiency of a complaint have held that "general allegations of emotional distress do not comply with federal pleading requirements." *Velazquez v. Helmerich & Payne Int'l Drilling Co.*, No. 15-cv-17, 2015 WL 871339, at *6 (N.D. Okla. Feb. 27, 2015) (citations omitted).

In this case, Plaintiff's factual allegations concerning her emotional distress are insufficient to establish the level of severity that is "an essential element" of a claim for IIED. *Id.* Plaintiff's only support for her claim that she "experience[d] severe emotional

distress during and after the incident," (Doc. 2, ¶ 39), is a list of the physical symptoms that she allegedly suffered "during the incident," *id.* at ¶ 40, and experiences "whenever [she] is reminded of the event," *id.* at ¶¶ 42-43. Those symptoms are "racing heart, shortness of breath, uncontrollable shaking, and nausea." *Id.* at ¶ 42. In addition, Plaintiff alleges that when she is reminded of the event, she also suffers the additional physical symptoms of "sweating, tightness in throat, headache, and hot flashes." *Id.* at ¶ 43.[13] The Tenth Circuit has rejected evidence of similar transient symptoms as insufficient to support a claim. *Daemi*, 931 F.2d at 1389 (holding that distress that "made [plaintiff] literally sick to his stomach" for which he sought treatment from a doctor was "legally insufficient under Oklahoma law" to establish a claim for IIED). Plaintiff has not alleged that she ever sought counseling or psychological treatment for her emotional distress. She also has not alleged that she ever sought medical treatment for the purported physical symptoms of her distress. Nor has she alleged "that the distress interfered with [her] ability to conduct [her] daily life affairs" to such a degree that no reasonable person would be able to cope. *Zeran*, 203 F.3d at 721. Indeed, Plaintiff has expressly alleged that she successfully continues to travel by air "more often than monthly" despite her emotional distress; she is plainly able to endure the distress and cope while conducting her life. (Doc. 2, ¶ 46). The burden of having to manage "transient" emotional distress that arises in particular situations is not actionable, but "a part of the price of living among people." Restatement (Second) of Torts § 46, cmt. j. Aside from coping with her distress and alleged physical symptoms when she travels by air, which

---

[13] Plaintiff also alleges that she experienced "fear of loss of control of her body" and "emotional numbness," (Doc. 2, ¶ 43), but those allegations refer to her mental state rather than any physical symptom. The allegations of "fear" and "emotional numbness" appear indistinct from the conclusory allegation that Plaintiff "experienced severe emotional distress," *id.* at ¶ 39.

28

she is apparently able to manage successfully, the only other impact on Plaintiff's life is that she "attempts to avoid thinking about the event or talking with others about the event." (Doc. 2, ¶ 45). Accordingly, while Defendants do not intend to trivialize Plaintiff's subjective distress, the law is clear that her allegations are insufficient to meet the objective pleading standard for stating actionable severity. Plaintiff's IIED claim should be dismissed pursuant to Rule 12(b)(6).

## V.    Conclusion

For the foregoing reasons, Defendant United States respectfully requests that Plaintiff's Complaint be dismissed with prejudice.

Respectfully submitted,

UNITED STATES OF AMERICA

CLINTON J. JOHNSON
Acting United States Attorney

*s/Rachael F. Zintgraff*
RACHAEL F. ZINTGRAFF, OBA No. 31597
Assistant United States Attorney
110 West 7th Street, Suite 300
Tulsa, Oklahoma 74119
T: 918-382-2700
F: 918-560-7948
Rachael.Zintgraff@usdoj.gov

**Certificate of Service**

      I hereby certify that on December 21, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notification of such filings to the parties entitled to receive notice.

                                    *s/Michelle Hammock*_____

                                    Michelle Hammock
                                    Paralegal Specialist