**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

Rhonda Mengert,

*Plaintiff*

v.

United States of America,

*Defendant*

Case No. 21-CV-443 (CVE) (SH)

**PLAINTIFF'S OPPOSITION TO DEFENDANT UNITED**
**STATES OF AMERICA'S MOTION TO DISMISS**

## Table of Contents

Table of Contents ........................................................................................................... 2

Table of Authorities ....................................................................................................... 3

I.    Introduction ........................................................................................................ 5

II.   Standard of Review ............................................................................................. 5

III.  Argument ............................................................................................................ 7

   A.   Sovereign Immunity Has Been Waived Because TSA Screeners Are "Investigative or
   Law Enforcement Officers" Pursuant to the Federal Tort Claims Act ....................................... 7

      1.   The FTCA's Waiver of Sovereign Immunity Is To Be Construed Broadly ................... 9

      2.   TSA Screeners Are "Officers of the United States" ...................................... 10

      3.   TSA Screeners Are "Empowered By Law" To Conduct Searches ............................... 12

      4.   The "For Violations of Federal Law" Clause Does Not Save the Government ............. 16

   B.   Defendants' Argument That Subjecting a Grandmother to a Strip Search Without Lawful
   Authority Is Not "Outrageous" As A Matter of Law is Frivolous and Dishonest ................... 18

   C.   Plaintiff Sufficiently Pled "Severe" Emotional Distress ................................... 21

IV.   Conclusion ........................................................................................................ 24

## **Table of Authorities**

### **Cases**

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................. 6

*Bunch v. United States*, 880 F.3d 938 (7th Cir. 2018) ................................................... 9

*Caceres v. Port Authority of New York New Jersey*, Case No. 06-CV-1558 (S.D.N.Y., Sep. 23, 2008)....................................................................................................................... 19

*Canyon Fuel Co. v. Sec'y of Labor*, 894 F.3d 1279 (10th Cir. 2018) ........................... 12

*Corbett v. Transp. Sec. Admin.*, 568 F. App'x 690 (11th Cir. 2014)......................... 8, 10

*Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379 (10th Cir. 1991).............. 22, 23

*Dillman v. Tuolumne Cnty.*, Case No. 13-CV-00404 (E.D. Cal., Apr. 30, 2014) ....... 19

*Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3rd Cir. 2018) ............................... 18

*Dolan v. U.S. Postal Serv.*, 546 U.S. 481 (2006)........................................................... 9

*Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003)......................................... 20

*Everson v. Michigan Dept. of Corrections,* 391 F.3d 737 (6th Cir. 2004) ................... 18

*Hargis v. Equinox Collection Servs., Inc.*, Case No. 17-CV-410- (N.D. Okla., Jun. 3, 2019)....... 6

*Harris v. Miller*, 818 F.3d 49 (2nd Cir. 2016) ............................................................. 18

*Holt v. United States*, 46 F.3d 1000 (10th Cir. 1995) .................................................... 6

*Iverson v. United States*, 973 F.3d 843 (8th Cir. 2020) ........................................ passim

*Leinen v. City of Elgin*, Case No. 98-CV-8225 (N.D. Ill., Aug. 14, 2000).................. 19

*Millbrook v. United States*, 569 U.S. 50 (2013)............................................................. 7

*Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285 (10th Cir. 2005) ............................................................................................ 6

*Pellegrino v. Transp. Sec. Admin.*, 937 F.3d 164 (3rd Cir. 2019) (*en banc*) ........................ passim

*Terry v. Ohio*, 392 U.S. 1 (1968) ................................................................................. 14

*Tikk-A-Wok, Inc. v. Travelers Cas. Ins. Co. of Am.*, Case No. 18-CV-570 (N.D. Okla., Jul. 17, 2019)....................................................................................................................... 6

*Webb-Beigel v. United States*, No. CV-18-00352-TUC-JGZ (D. Ariz., Sep. 30th, 2019) ............. 8

*York v. Story*, 324 F.2d 450 (9th Cir. 1963).................................................................. 18

### **Statutes**

18 U.S.C. § 115(c)(1)..................................................................................................... 17

28 U.S.C. § 2680(h) ................................................................................ 7, 12, 15, 16

49 U.S.C. § 44901(a) .................................................................................................... 13

49 U.S.C. § 44902 ........................................................................................................ 13

49 U.S.C. § 46505 ........................................................................................................ 16

5 U.S.C. § 8331(20) ...................................................................................................... 17

## **Regulations**

49 CFR § 1540.107(a)....................................................................................................... 13

## **Rules**

11th Cir. R. 36-2 .............................................................................................................. 7
Fed. R. Civ. P 12(b) ..................................................................................................... 5, 6
Fed. R. Civ. P. 11(b) ....................................................................................................... 21

## **Treatises**

RESTATEMENT (SECOND) OF TORTS § 46 ............................................................................. 22

## I.    Introduction

On May 12th, 2019, Plaintiff Rhonda Mengert was strip searched by two screeners of the U.S. Transportation Security Administration ("TSA").  The sole purported reason?  She was wearing a feminine hygiene product. This strip search was in violation of TSA policy, which forbids its checkpoint staff from conducting strip searches under *any* circumstances, let alone such an everyday and innocent circumstance as this one.  It was also in violation of the Fourth Amendment, in violation of the common bounds of human decency, and most relevantly, in violation of Oklahoma tort law.

Defendant United States of America comes before the Court with a motion to dismiss, ECF No. 11, alleging two defenses.  The first – that sovereign immunity has not been waived for the intentional torts of TSA screeners – has been a loser in every precedential Court of Appeals decision ever to address the matter.  The second – that an unlawful and unprovoked airport strip search is not sufficiently "extreme and outrageous" or "severe" enough in injury to meet the elements of IIED – is disgusting and frivolous.  Plaintiff hereby opposes Defendant's motion.

## II.    Standard of Review

Defendants' bring their motion under Rule 12(b), subparts (1) and (6), which require dismissal of complaints for which the Court lacks subject matter jurisdiction, or for which the legal or factual allegations of the complaint do not add up to a claim for which the Court can grant relief, respectively.  Fed. R. Civ. P. 12.

"Rule 12(b)(1) motions generally take the form of either a facial or a factual attack. Under a facial attack, the movant merely challenges the sufficiency of the complaint, requiring the district court to accept the allegations in the complaint as true. In contrast, the movant bringing a factual attack goes beyond the allegations in the complaint and challenges the facts upon which subject matter jurisdiction depends." *Hargis v. Equinox Collection Servs., Inc.*, Case No. 17-CV-410 (N.D. Okla., Jun. 3, 2019) (Dowdell, C. J.) (*internal quotations omitted*), *citing Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005); *Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995). In this instance, there are no disputed facts regarding subject-matter jurisdiction: the government alleges that as a matter of law, sovereign immunity bars claims against TSA screeners for intentional torts.

On the other hand, Rule 12(b)(6) motions may only be of the "facial" variety. "The Court must accept all the well-pleaded factual allegations of the complaint as true, even if doubtful, and must construe the allegations in the light most favorable to claimant." *Tikk-A-Wok, Inc. v. Travelers Cas. Ins. Co. of Am.*, Case No. 18-CV-570 at *3 (N.D. Okla., Jul. 17, 2019) (Dowdell, C. J.), *citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While mere "labels and conclusions" will not do, the Court must "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.*, *citing Twombly* at 570.

### III.   __Argument__

A.   _Sovereign Immunity Has Been Waived Because TSA Screeners Are "Investigative or Law_
_Enforcement Officers" Pursuant to the Federal Tort Claims Act_

Defendant argues that the Federal Tort Claims Act ("FTCA") bars intentional tort claims
against TSA screeners.  Mot. to Dismiss, pp. 13 – 27[1].  As an initial matter, 28 U.S.C. § 2680(h)
does exclude "[a]ny claim arising out of … false imprisonment" and several other intentional torts.
However, the statute continues to provide an exception to the exception: false imprisonment claims
where the actor(s) are "investigative or law enforcement officers of the United States Government"
may still proceed.  _Id_.  "For the purpose of this subsection, 'investigative or law enforcement
officer' means any officer of the United States who is empowered by law to execute searches, to
seize evidence, or to make arrests for violations of Federal law."  _Id_.  This section of law has come
to be known by courts as the "law enforcement proviso."  _Millbrook v. United States_, 569 U.S. 50,
52, 53 (2013).  The parties here agree that the TSA screeners who injured Plaintiff – with job titles
of "Transportation Security Officer" ("TSO") and "Lead Transportation Security Officer" – are
not "law enforcement officers."  Mot. to Dismiss, Ex. 1 (Crawford Decl.), pp. 4, 5.  It is whether
or not non-law enforcement TSA screeners are "_investigative or_ law enforcement officers" under
this definition that is in dispute.

To date, three circuits have decided this question.  The first was the Eleventh Circuit, in a
non-published, non-precedential[2] opinion where the appellant was a non-attorney, _pro se_ litigant

---

[1] All page numbers in this brief correspond to ECF-stamped header page numbers, not litigant-
provided footer page numbers.
[2] _See_ 11th Cir. R. 36-2.

and the case was decided without the benefit of oral argument.  *Corbett v. Transp. Sec. Admin.*, 568 F. App'x 690, 700–02 (11th Cir. 2014).  In that case, the court held that TSA screeners are not "officers of the United States" and therefore, notwithstanding what they are "empowered by law" to do, the law enforcement proviso does not apply to them.  *Id*.  In the eight years since that decision, no court of which the undersigned counsel is aware has adopted that position.

The other two circuits were the Third and Eighth Circuits.  *Pellegrino v. Transp. Sec. Admin.*, 937 F.3d 164 (3rd Cir. 2019) (*en banc*); *Iverson v. United States*, 973 F.3d 843 (8th Cir. 2020).  These cases are published, precedential in their circuits, were argued by experienced counsel, were decided with the benefit of oral arguments, and in the case of *Pellegrino*, it was decided *en banc*.  Both of these cases found that TSA screeners are covered by the law enforcement proviso because they are plainly and obviously "*empowered by law* to execute searches." *Iverson* at 851.  Both cases explicitly cited the Eleventh Circuit's decision in *Corbett* and rejected it. <u>*See also*</u> <u>*Webb-Beigel v. United States*</u>, No. CV-18-00352-TUC-JGZ (D. Ariz., Sep. 30th, 2019) ("The Third Circuit had the benefit of deciding *Pellegrino* after extensive briefing on the issue from both sides. This appears not to have been the case in other courts," citing *Corbett* "where plaintiff filed a *pro se* complaint and appeal").

The government asks the Court to follow the reasoning of the Eleventh Circuit's non-precedential opinion and go against the well-reasoned opinions of the *en banc* Third Circuit as well as the Eighth Circuit.  Plaintiff will step through the government's argument to demonstrate the imprudence of acquiescing their request.

### 1.   *The FTCA's Waiver of Sovereign Immunity Is To Be Construed Broadly*

Before parsing the words of the law enforcement proviso, the Court should consider, and reject, Defendant's invitation to construe the waiver of sovereign immunity provided by the FTCA "narrowly."  Mot. to Dismiss, pp. 22, 23.  That request comes in confrontation with the Supreme Court's holding that the FTCA is generally to be broadly construed in favor of affording a remedy for torts by government employees.  *Dolan v. U.S. Postal Serv.*, 546 U.S. 481 (2006).   In *Dolan*, the Supreme Court explicitly stated that the FTCA "does not implicate the general rule that 'a waiver of the Government's sovereign immunity will be strictly construed ... in favor of the sovereign," because Congress intentionally worded the FTCA to waive sovereign immunity using "sweeping language." *Id*. at 491.  Courts in many circuits have faithfully applied *Dolan*, including in this exact context.  *Pellegrino* at 171 (in considering law enforcement proviso, "if there were uncertainty about the reach of the term 'officer of the United States,' it would be resolved in favor of a broad scope."); *Iverson* at 854 (in considering law enforcement proviso, construing waiver broadly "is consistent with the Supreme Court's instructions and our sister circuits' interpretations."); *Bunch v. United States*, 880 F.3d 938, 944-45 (7th Cir. 2018) ("As we construe this language, we must bear in mind the Supreme Court's insistence that we not construe the waiver of sovereign immunity in the FTCA too strictly.").

Counsel for the government has apparently read *Dolan*, having cited it elsewhere in its brief (Mot. to Dismiss, p. 16), but tellingly decides not to engage with it in the section of its brief where it asks the Court to interpret FTCA's waiver as narrow.  The Eleventh Circuit also entirely

- 9 -

neglected to engage with *Dolan*[3]. *Corbett* at 700–02. Dissenting Judges Krause in *Pellegrino* and Gruender in *Iverson* attempted to engage with *Dolan* by positing that since the law enforcement proviso is an "exception to an exception," the courts should reverse course and go back to the traditional rule of narrow construction. *Pellegrino* at 200 (Krause, J., *dissenting*); *Iverson* at 866 (Gruender, J., *dissenting*). But as the majority in *Iverson* point out, *Dolan* stands for a broad waiver of sovereign immunity "within the FTCA context," whether "analyzing an exception or an exception to the exception." *Pellegrino* at 854.

### 2.   TSA Screeners Are "Officers of the United States"

The Eleventh Circuit in *Corbett*, and the dissenting judge in *Iverson*, found that Transportation Security Officers for the United States Transportation Security Administration are not "officers of the United States." Mot. to Dismiss, pp. 23 – 26, <u>*citing* *Corbett*</u> at 700-02, *Iverson* at 855-68 (Gruender, J., *dissenting*). They argue that we must distinguish "officers" from "employees" and that the law enforcement proviso cannot apply to the latter.

As a threshold matter, TSA screeners, including the ones who injured Plaintiff, hold the title "Transportation Security Officer, and TSOs wear uniforms with badges that prominently

---

[3] A review of the briefs of the parties in *Corbett* shows that *Dolan* was not brought to the court's attention, perhaps leading to its erroneously narrow construction of the waiver provided by the law enforcement proviso.

display the title 'US Officer[4].'" *Pellegrino* at 170. "Officer of the United States" is more broad than "Law Enforcement Officer of the United States, and in both traditional and contemporary usage of the word, "officer" harmonizes with the role TSA screeners perform:

> "'Ordinarily, a word's usage accords with its dictionary definition.' *Yates v. United States*, 135 S. Ct. 1074, 1082 (2015). Under one prominent dictionary definition shortly before 1974, the year of the proviso's enactment, an officer 'serve[s] in a position of trust' or 'authority,' especially as 'provided for by law.' *Officer*, Webster's Third New International Dictionary (1971); *see also Officer*, Black's Law Dictionary (4th ed. rev. 1968) ('[A]n officer is one holding a position of trust and authority…'). TSOs satisfy this definition, as they are 'tasked with assisting in a critical aspect of national security — securing our nation's airports and air traffic.' *Vanderklok v. United States*, 868 F.3d 189, 207 (3d Cir. 2017). To take another definition from the time, officers are 'charged' by the Government 'with the power and duty of exercising certain functions . . . to be exercised for the public benefit.' *Officer*, Black's Law Dictionary, *supra*. TSOs qualify under this definition as well, as they perform 'the screening of all passengers and property,' 49 U.S.C. § 44901(a), to protect travelers from hijackings, acts of terror, and other threats to public safety. For good reason, the role is Transportation Security Officer, and TSOs wear uniforms with badges that prominently display the title 'Officer.' Hence they are 'officer[s]' under the proviso."

*Pellegrino* at 170. *Iverson* held the same:

---

[4] It should be noted that TSA purposely added "Officer" badges to their checkpoint screeners' uniforms in 2008 to command respect from the public. *See Pellegrino* at 170, fn. 1. The badge on the left is that of a TSO. The badge on the right is that of a TSA federal law enforcement officer (air marshal). One is an "Officer of the United States" and the other is not??




We also conclude that TSOs are officers. They are "charged with a duty," *Officer*, Webster's Third New Int'l Dictionary (1971), and "charged by a superior power ... with the power and duty of exercising certain functions." *Officer*, Black's Law Dictionary (4th ed., rev. 1968). Congress, by statute, charged TSOs with the power to conduct airport screenings. See 49 U.S.C. § 44901.

Those screenings are a " function[ ] of the government ... exercised for the public benefit." *Officer*, Black's Law Dictionary (4th ed., rev. 1968). Specifically, the screenings ensure that no passenger enters a plane with a prohibited item, including "weapons, explosives, and incendiaries." 49 C.F.R. § 1540.5 (defining "Screening function"). This function protects passenger safety and national security.

Further, TSOs "serve in a position of ... authority." *Officer*, Webster's Third New Int'l Dictionary (1971). The TSA holds them out to the public as officers through their title and uniforms. It does so to ensure the public respects them.

*Iverson* at 848.

In addition to the sound reasoning of the *Pellegrino* and *Iverson* courts, there is another fundamental reason why we should not construe "officers of the United States" to speak only of law enforcement officers: adopting the logic that "Officers of the United States" speaks only traditional law enforcement officers would mean that when Congress said "investigative or law enforcement officers," they intended to cover the exact same group of people as if they had only said "law enforcement officers."   This converts the words "investigative or" into surplusage. When possible, "we should interpret the standard to give effect to each word and clause." *Canyon Fuel Co. v. Sec'y of Labor*, 894 F.3d 1279, 1289 (10th Cir. 2018).

### 3.  TSA Screeners Are "Empowered By Law" To Conduct Searches

Congress did not leave us to guess who qualifies as "investigative or law enforcement officers" – the statute provides a definition of the term: "any officer of the United States who is *empowered by law* to execute searches, to seize evidence, **or** to make arrests for violations of Federal law." 28 U.S.C. § 2680(h) (*emphasis added*).  If *any* of these three qualifications apply,

the proviso applies and Defendant's motion to dismiss should be denied as to sovereign immunity. In the case of TSA, the first of these three is easily satisfied[5].

As is obvious, a TSA screener's job is *almost exclusively* that of executing searches of both passengers and their property, as required by law.  To state the obvious, they are not a volunteer militia, nor are they government employees who decided on their own to conduct these searches without legislative authorization.  Likewise, passengers are not given an option of skipping the search, assuming they would like to travel.  These truths would be self-evident to anyone who has ever entered an airport since the TSA's inception in 2002, and it is beyond debate that TSA is "empowered by federal law" to do what they do at the checkpoints.

But, for the record, the laws that empower TSA screeners to conduct searches are codified in several statutes and regulations.  49 U.S.C. § 44901(a) requires "the screening of all passengers and property."   49 U.S.C. § 44902 requires TSA to promulgate regulations to deny boarding to "a passenger who does not consent to a search[6] under" §44901(a).  TSA implemented §§ 44901 and 44902 with, *inter alia*, 49 CFR § 1540.107(a), which provides that no one may "board an aircraft

---

[5] However, TSA does also have at least *limited* authority to seize evidence and to detain passengers, even if only temporarily while law enforcement officers are on the way.  This is hinted at in Mot. to Dismiss, Ex. 1 (Crawford Decl.), ¶ 10, where TSA speaks of what happens when they find illegal contraband: they must call the police.  But if TSA screeners find, for example, a gun, they obviously do not return it to the passenger while awaiting police arrival; they hold it, as do they the passenger.  This is a seizure of evidence and a seizure of the person, however brief.

[6] TSA's enabling statutes vacillate between describing this work as "searches," "screenings," "examinations," and "inspections."   The statutes appear to use these words entirely interchangeably, but it matters not: just as a police officer cannot evade a search warrant requirement by describing their conduct as a "screening" or "inspection," TSA is plainly "searching" whether they call it that or not.  Likewise, the government's argument that the statute says "execute searches" instead of "conduct searches" has significance, Mot. to Dismiss, p. 16, is nitpicking phrases that are interchangeable.

without submitting to the screening and inspection of his or her person and accessible property." And it is the TSOs – like the two who injured Plaintiff – who are the ones empowered to carry these searches out. *Iverson* at 851 ("Congress thus mandated that TSOs carry out screenings and authorized physical searches as one means to complete that duty. The statute specifically authorizes federal employees, TSOs, to screen passengers and property. We consider this sufficient to conclude that they are empowered by law to conduct searches.").

The government is not really trying to convince the Court that TSA's screeners are not "empowered by law" at all, but rather that they are not empowered by law to conduct "searches" because, in their mind, "searches" are something that only law enforcement does. Mot. to Dismiss, pp. 20 – 22. This cramped definition is without foundation. "TSO screenings are 'searches' (i) as a matter of ordinary meaning, (ii) under the Fourth Amendment, and (iii) under the definition provided in *Terry v. Ohio*, 392 U.S. 1 (1968). Attempts to distinguish (iv) between administrative and criminal 'searches' are divorced from the plain text, and any distinction, if one must be made, should account for (v) the fact that TSA searches extend to the general public and involve examinations of an individual's physical person and her property." *Pellegrino* at 172.

Defendants argument can only be vindicated by modifying the text of the statute to cover only "criminal searches" or "law enforcement searches." Mot. to Dismiss, p. 21 ("But the ATSA does not grant those screening personnel any *law enforcement powers* to execute searches, seize evidence, and make arrests."), ("…TSA screeners do not conduct *criminal* investigations…") (*emphasis added*). In praying that the Court effectively inserts the words "criminal law enforcement" between the words "execute" and "searches" in § 2680(h), they hope that the Court finds that TSA's checkpoint screening staff is on one side of the line and its federal law

- 14 -

enforcement officers (such as federal air marshals) are on the other.  But the text of the law plainly makes no such distinction[7], and in fact, the addition of the words "investigative or" make crystal clear that Congress intended *more* than law enforcement searches to be covered by the proviso. The existence of law enforcement employees of TSA who are empowered to conduct criminal searches does not mean that the administrative searches conducted by TSOs are not *also* "empowered by law," or that they are not "searches."  The law enforcement proviso covers both sets of employees.

"*Searches* is neither an obscure word nor is its meaning doubtful." *Iverson* at 853 (refusing to resort to canons of construction to define "searches" when the meaning is already plain); *see also Iverson* at 854 (refusing to resort to legislative history for the same reason).  Nor should the Court resort to definitions of "investigative or law enforcement officer" in different statutes, *see* Mot. to Dismiss, p. 15, when the relevant statute provides its own definition.  The Court should find that TSOs are plainly "empowered by law to execute searches."

---

[7] The *Iverson* court went a step further and found that *even if* the law did make such a distinction, TSA screeners *do* conduct searches in the criminal context because they are searching for contraband, the possession of which may be a criminal offense.  "Under a heading indicating that it is discussing 'Criminal Law,' Black's defines a *search* as '[a]n examination of a man's ... person, with a view to the discovery of contraband or illicit or stolen property.' *Search*, Black's Law Dictionary (4th ed., rev. 1968). As discussed above, TSOs are given the power to execute physical searches, such as pat downs, with the intent of finding weapons, explosives, or other prohibited items. So even in the criminal context, TSOs' screenings constitute *searches*."  *Iverson* at 853.

### 4. The "For Violations of Federal Law" Clause Does Not Save the Government

We must return again to the text of the statute:

> "For the purpose of this subsection, 'investigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."

§ 2860(h).  Defendant argues that the words "for violations of Federal law" modify each of the three enumerated acts: searches, seizures, and arrests.  Mot. to Dismiss, p. 17.  "To begin, the phrase 'for violations of Federal law' may not even apply to the power to 'execute searches.'  When interpreting a statute that includes a list of terms or phrases followed by a limiting clause, that clause should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Pellegrino* at 177 (*cleaned up*).

It doesn't matter: TSA screeners are clearly looking "for violations of Federal law" when they are conducting their searches.  Weapons and explosives are banned from entering the secure area of the airport by federal law.  49 U.S.C. § 46505 (possession subject to *criminal* penalties).  Surely it is not Defendant's position that "preventing weapons from entering" is anything but of paramount importance on the list of daily tasks for a TSA screener.  And, even for prohibited-but-not-a-crime-to-possess items, such as water bottles over 3.4 oz, it is still federal law that they may not enter.  "The phrase 'for violations of Federal law' sweeps notably broader than other statutes that specify violations of *criminal* law."  *Pellegrino*[8] at 177.

---

[8] After failing at this argument in *Pellegrino*, TSA opted not to make it in *Iverson*.  *See Iverson* at 853, fn. 3.  It is unclear why they have brought it back here today, as no court of which the undersigned counsel is aware has ever accepted it.

Just because a TSO, upon uncovering a violation of federal law, must contact a law enforcement official to make the arrest, does not mean that the search itself was not intended to find violations of federal law.  Just because a TSO may also be looking for items that are prohibited by federal law, but not contraband subjecting the person in possession to criminal penalties, from entering the secure area does not mean the search is not looking for a violation of federal law. And, if Congress had intended "violations of Federal law," to be limited only to violations of federal *criminal* law, they have shown that they are more than able to make such a distinction.  *See* 18 U.S.C. § 115(c)(1) ("any violation of Federal criminal law"); 5 U.S.C. § 8331(20) ("offenses against the criminal laws of the United States").  Congress here was simply trying to distinguish between those who are searching pursuant to *state* law versus those who are searching pursuant to *federal* law.  TSOs are unquestionably the latter.

B. *Defendants' Argument That Subjecting a Grandmother to a Strip Search Without Lawful Authority Is Not "Outrageous" As A Matter of Law is Frivolous and Dishonest*

"The desire to shield one's unclothed figure from view of strangers … is impelled by elementary self-respect and personal dignity." *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963); *see also Everson v. Michigan Dept. of Corrections,* 391 F.3d 737, 757 (6th Cir. 2004); *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 527 n. 53 (3rd Cir. 2018); *Harris v. Miller*, 818 F.3d 49, 59 (2nd Cir. 2016); *etc*.

Defendant spends 6 pages arguing that ordering an elderly woman, suspected of no crime, into a private room and ordering her to drop her panties so that government agents can get a good look at her genitals and feminine hygiene pad, without lawful authority and in direct violation of the government agency's policies, is not "extreme and outrageous" *as a matter of law*.  Mot. to Dismiss, pp. 27 – 34.  In other words: that no reasonable jury could find what happened to Mrs. Mengert to be extreme or outrageous.  What is extreme and outrageous, in addition to illegal strip searches, are these 6 pages of frivolous argument.  It is further outrageous that they mischaracterize the facts alleged in the complaint as merely being "asked to remove the item in a private screening room in the presence of two other members of her gender."  Mot. to Dismiss, p. 31.  What was actually alleged is that Plaintiff was ordered "to take down her pants and underwear down to her knees and remove the feminine hygiene product," in the process "exposing her genitals and underwear [to] the screeners."  Complaint, ¶¶ 33, 36.  If Mrs. Mengert were merely asked to remove an item without being forced to strip half-naked and expose herself to these screeners, we would not be here today, but that is not the accusation and defense counsel knows it.

With the facts straight, in considering how to respond to the absurd proposition that unlawful strip searches are *per se* not extreme and outrageous, counsel for Plaintiff began by searching to see if courts had responded to the absurd before. However, it appears that courts have only debated whether a strip search without probable cause was "extreme and outrageous" *in the context of prisoners*, perhaps because no one has before argued that a strip search lacking even arguable probable cause might not provoke outrage in polite society. Prisoner success on IIED claims is mixed and dependent on facts, as would be expected since strip searches furthering legitimate penological interests are allowed. *Leinen v. City of Elgin*, Case No. 98-CV-8225 (N.D. Ill., Aug. 14, 2000) (search of prisoner-plaintiff's breasts extreme and outrageous *if* Plaintiff proves retaliatory motive); *Dillman v. Tuolumne Cnty.*, Case No. 13-CV-00404 at *17 (E.D. Cal., Apr. 30, 2014) (on allegations of a police strip search, two-hour detention, and insults, a "reasonable trier of fact could find that Defendants' conduct was extreme and outrageous"). Plaintiff was not a prisoner, and because probable cause did not even arguably exist, these cases will not help us much. The closest we may come, perhaps, are cases of strip searches incident to (false) arrests made not with malice but without probable cause; in these cases, judges have had no trouble submitting the question to a jury. *Caceres v. Port Authority of New York New Jersey*, Case No. 06-CV-1558 at *34 (S.D.N.Y., Sep. 23, 2008) ("subjecting the plaintiff to a strip search without probable cause for such an intrusive search could be considered extreme and outrageous").

On the other side, it appears that Defendant had no luck with the case law databases either: in support of their argument, Defendant cited not a single case where a comparable strip-search was held to be less than extreme and outrageous. The closest they come is a case of medical exams of pre-school children by a public health organization without parental consent. Mot. to Dismiss,

p. 33, _citing Dubbs v. Head Start, Inc._, 336 F.3d 1194 (10th Cir. 2003) (at 1217, "the examinations

did not go beyond the reasonable bounds of standard well-child examinations"),

Normal, rational humans can tell the difference between the outrageousness of a _bona fide_

(albeit lacking in parental consent) medical exam of a child and an illegal government strip search.

A three-year-old is not likely to be traumatized for more than minutes by seeing a doctor, while

ordering an adult off to the side to strip her and look at her vulva and pad is far more likely to

traumatize in the long term.  So, too, can normal, rational humans differentiate between voluntary

use of a locker room[9], Mot. to Dismiss, p. 31, and involuntarily forcing grandma to shred her

dignity in the face of a policy that clearly, explicitly, and unambiguously prohibits just that.  A

rational jury could conclude that the latter is extreme, outrageous, shocking, appalling, beyond the

bounds of human decency, and indeed, _disgusting_ behavior.  _Consent_ is the difference between

sex and rape, between sharing and theft, between sport and aggravated assault, between a locker

room and a strip search, and between what society will tolerate and what is "extreme and

outrageous."

Plaintiff is certain that the learned counsel in the U.S. Department of Justice are capable of

making these distinctions.  It takes no more than asking one's self, "Would I be outraged if this

happened to my mother?"  Defendant concedes that determining whether conduct is extreme and

outrageous is typically a function of the jury.  Mot. to Dismiss, p. 30 (court only plays "gatekeeper

---

[9] After consulting with several women on the subject, counsel for Plaintiff is confident that despite Defendants' characterization, women in locker rooms do not go around "observing" each other's feminine hygiene products.

role").  They will be hard-pressed to find a jury that would answer the above question in the

negative, and certainly are not entitled to a determination in the negative as a matter of law.

Finally, Defendant's argument is dishonest when they attempt to argue that there was an

aviation security need for what they did to Plaintiff.  Mot. to Dismiss, p. 31, fn. 12.  The TSA itself

has unequivocally concluded that strip searches are <u>not</u> necessary during TSA screenings, ever,

Complaint, ¶ 27, a fact which Defendant does not dispute.  There is, in fact, a procedure for

resolving the finding of a feminine hygiene product, and it involves an explosive trace swab after

the pat-down, with no removal of clothing necessary.  Complaint, ¶ 26.  It was not within the

purview of these two screeners to invent new, additional, highly invasive and offensive, and

unconstitutional means of securing our airports that TSA has expressly prohibited, regardless of

whether these two screeners acted out of a genuine desire to keep air travel safe (and there is

certainly no evidence at this time that they were so motivated, nor would it be appropriate to

consider such evidence in a motion to dismiss).

The Court should emphatically reject Defendant's arguments as to the extreme and

outrageous element of intentional infliction of emotional distress and remind them of their

obligations under Fed. R. Civ. P. 11(b).


C.  _Plaintiff Sufficiently Pled "Severe" Emotional Distress_

As with the "extreme and outrageous" issue, Defendants concede that at this point, the

Court merely needs to determine whether the allegations relating to the severity of Plaintiff's

distress are enough that a reasonable jury could find severe emotional distress.  Mot. to Dismiss,

p. 34 ("The Court is to make a … threshold determiniation…," *citation omitted*).  The test for severity they suggest is that it must be "of such a character that 'no reasonable person could be expected to endure it.'"  *Id*., <u>*citing Daemi v. Church's Fried Chicken, Inc.*</u>, 931 F.2d 1379, 1389 (10th Cir. 1991).  Fair enough.

The severity requirement for IIED is designed to prevent lawsuits from garden-variety annoyances of life where the resulting "trauma" amounts to no more than hurt feelings.  Thus, society may expect a "reasonable person … to endure" insults and petty slights even if they are made to feel some embarrassment, sadness, anger, or other negative emotion.  RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965) (liability "clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities").

In support of her claim for emotional distress, Plaintiff's complaint pled that both *during* and *after, whenever thinking of the incident*, she experiences "symptoms of a panic attack, including racing heart, shortness of breath, uncontrollable shaking, and nausea."  Complaint, ¶¶ 40, 42.  These are symptoms consistent with diagnosable panic disorder[10].  <u>*See*</u> Exhibit 6, Mayo Clinic, "Panic attacks and panic disorder."  The uncontrollable shaking is "particularly severe, such that she cannot control the movement of her arms and that the trembling of her legs requires her to sit to avoid falling."  *Id*., ¶ 44.  Since the incident, she also "experiences recurrent, unwanted, distressing memories of the event."  *Id*., ¶ 41.  Any time she is "reminded of the event, she also experiences additional symptoms: fear of loss of control of her body, sweating, tightness in throat,

---

[10] Plaintiff does not need to demonstrate a medical diagnosis, or even that she has symptoms of a medical condition.  The jury is free to use its lay opinion to determine whether Plaintiff's emotional distress was sufficiently severe based on the evidence it receives proving the allegations pled in the complaint.

headache, and hot flashes, followed by emotional numbness." *Id*., ¶ 43.  These symptoms are so unpleasant that she "attempts to avoid thinking about the event or talking with others about" the trauma inflicted upon her by these two rogue TSA screeners.  *Id*., ¶ 45.

 "Mengert is required to regularly travel by air for her job – typically more often than monthly – and has had to travel on many additional occasions between the date of the incident and the date of the filing of the original complaint in this action. Mengert is thus regularly reminded of the incident as a result of her frequent need to traverse TSA checkpoints, and experiences the symptoms described in paragraphs 39 – 44 (and has found that even approaching non-TSA security, outside of the airport causes a relapse)." *Id.*, ¶¶ 46, 47.  "Mengert has relived the physical and psychological symptoms … no less than several times per month since the incident."  *Id*., ¶ 48.

These symptoms are substantially more severe than a Plaintiff who alleges he was "sick to his stomach" on one occasion.  *Id*, p. 35, *citing Daemi* at 1389.  Plainly, this case is distinguishable, and Defendant cites no case law of individuals actually situated similarly.

Defendant's assertion that Plaintiff is "able to endure the distress and cope while conducting her life," *id*., and therefore has pled insufficiently severe emotional distress, is both legally and morally bankrupt.  Under this proposed test by Defendant, any trauma insufficient to kill you or send you to a mental hospital would be inadequate.  A mother grieving after watching her child be struck and killed by a drunk driver, who manages to get up to go to work, could also be described as "coping" – but that is entirely irrelevant as to whether she has severe enough emotional distress to sue the driver for IIED, for the standard is that no reasonable person "*should be expected*" to endure it, not that they literally "*cannot*" endure it.

- 23 -

No person should be expected to endure *any* lasting trauma from going through a TSA checkpoint: it's supposed to be a simple security check, not a life-altering experience.  What happened to Mrs. Mengert did not need to happen, and would have been avoided if these TSA screeners had followed clear policy.  Thus, based on the "no reasonable person … expected to endure it" standard that Defendant proposes the Court use to evaluate the claim, the jury is free to determine that no reasonable person should have to be traumatized *at all* by TSA.  Regardless, no colorable argument can be made that emotional stress so bad that one cannot even control their legs sufficient to stand is not "severe" enough as a matter of law.

**IV.**   **Conclusion**

For the foregoing reasons, Defendant's motion to dismiss should be **denied** in its entirety and Defendant United States of America should be **ordered** to answer the complaint within 14 days.

Dated: Tulsa, OK                                    Respectfully submitted,

January 11th, 2022

_____*/s/Jonathan Corbett*_____
Jonathan Corbett, Esq.
Attorney for Plaintiff (*admitted pro hac vice*)
CA Bar #325608
958 N. Western Ave. #765
Hollywood, CA 90029
E-mail: jon@corbettrights.com
Phone: (310) 684-3870
FAX:   (310) 675-7080