UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RHONDA MENGERT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-CV-0443-CVE-SH |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the Court are defendant's motion to dismiss (Dkt. # 11); plaintiff's response (Dkt. # 13); and defendant's reply (Dkt. # 14). This case arises out of a May 12, 2019 incident involving plaintiff, Rhonda Mengert, and two Transportation Security Administration (TSA) officers at Tulsa International Airport. On October 13, 2021, plaintiff filed a complaint in federal court, alleging two claims for relief under the Federal Tort Claims Act (FTCA): false imprisonment (count 1) and intentional infliction of emotional distress (IIED) (count 2). On December 21, 2021, defendant United States of America moved, pursuant to Fed. R. Civ. P. 12(b)(1) and (6), to dismiss plaintiff's claims.

I.

Plaintiff Rhonda Mengert was traveling through Tulsa International Airport on May 12, 2019. Dkt. # 2, at 2. Plaintiff was a ticketed passenger and enrolled in TSA's PreCheck trusted travelers program, "whereby passengers submit to a background check and are 'cleared' by the TSA as low security risk and thereafter are subjected to reduced security screening requirements." Id. After presenting her boarding pass, plaintiff entered the TSA PreCheck screening checkpoint. Id. "Inside

of the checkpoint, the TSA has a standard walk-through metal detector present for [] screening[.]" Id. However, because plaintiff has a metal joint implant, she requested a body scanner screening, which is standard TSA procedure for screening passengers with metal joint implants because the body scanners "do not detect items beneath the skin." Id. at 2-3. Plaintiff "was screened via body scanner, but at the conclusion of that screening she was informed that she would have to submit to additional screening via pat-down." Id. at 3. TSA pat-down screening procedure includes touching a passenger's groin area with the back of the screener's hands, as well as sliding the hands up the inside of a passenger's leg until the screener "meets resistance." Id. During plaintiff's pat-down, the TSA screener "touched an ordinary feminine hygiene product that [plaintiff] was wearing underneath her clothing." Id. Plaintiff alleges that TSA's procedure for such a circumstance is that no additional screening is required, and the pat-down is completed as normal. Id. at 4.

Notwithstanding, after the pat-down was concluded, and the TSA screener tested her gloves for explosives (which came back negative), plaintiff was informed that "she must go to a private room to be 'cleared.'" Id. Plaintiff was escorted by two female TSA screeners into a private room, and the screeners closed the door behind them. Id. The TSA screeners then proceeded to tell plaintiff that she must lower her pants and underwear down to her knees and "remove the feminine hygiene product for their visual inspection." Id. Plaintiff "objected to the proposition that she be subject to such a strip search." Id. The TSA screeners "informed [plaintiff] that her compliance was required." Id. Plaintiff complied, "exposing her genitals and underwear [to] the screeners." Id. at 5. After plaintiff complied with the screeners' request, she asked if she could leave the room--the screeners ignored her request to leave three times, and they eventually allowed her to leave the room, after she asked a fourth time. Id.

Plaintiff alleges that she "experienced severe emotional distress during and after the incident"; in particular, plaintiff "experienced symptoms of a panic attack, including racing heart, shortness of breath, uncontrollable shaking, and nausea." Id.  Since the incident, plaintiff "experiences recurrent, unwanted, distressing memories of the event[,] [and] [w]henever she is reminded of the event, she also experiences additional symptoms: fear of loss of control of her body, sweating, tightness in throat, headache, and hot flashes, followed by emotional numbness." Id. Although plaintiff tries to avoid thinking about the event or talking about it with others, she "is required to regularly travel via air for her job--typically more than monthly[.]"  Id. at 5-6. Consequently, plaintiff is "regularly reminded of the incident . . . and experiences the symptoms" described above, and "has relived the physical and psychological symptoms . . . no [fewer] than several times per month since the incident." Id.

## II.

Motions to dismiss under Rule 12(b)(1) "generally take one of two forms.  The moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell, 363 F.3d 1072, 1074 (10th Cir. 2004) (internal citation and quotations omitted).  Where a motion to dismiss is based on a facial attack, as here, courts "apply the same standards under Rule 12(b)(1) that are applicable to a Rule 12(b)(6) motion to dismiss for failure to state a cause of action." Muscogee (Creek) Nation v. Okla. Tax Comm'n, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010).

3

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must determine whether the claimant has stated a claim upon which relief may be granted. A motion to dismiss is properly granted when a complaint provides no "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A complaint must contain enough "facts to state a claim to relief that is plausible on its face" and the factual allegations "must be enough to raise a right to relief above the speculative level." Id. (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 562. Although decided within an antitrust context, Twombly "expounded the pleading standard for all civil actions." Ashcroft v. Iqbal, 556 U.S. 662, 683 (2009). For the purpose of making the dismissal determination, a court must accept all the well-pleaded allegations of the complaint as true, even if doubtful in fact, and must construe the allegations in the light most favorable to the claimant. Twombly, 550 U.S. at 555; Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007); Moffett v. Halliburton Energy Servs., Inc., 291 F.3d 1227, 1231 (10th Cir. 2002). However, a court need not accept as true those allegations that are conclusory in nature. Erikson v. Pawnee Cnty. Bd. Of Cnty. Comm'rs, 263 F.3d 1151, 1154-55 (10th Cir. 2001). "[C]onclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." Hall v. Bellmon, 935 F.2d 1106, 1109-10 (10th Cir. 1991).

### III.

Defendant moves to dismiss on the following grounds:

    *a.*    *Defendant's Motion to Dismiss Plaintiff's False Imprisonment Claim Under 12(b)(1)*

Defendant argues that, under Rule 12(b)(1), the Court lacks subject-matter jurisdiction because "the FTCA generally does not waive the United States' sovereign immunity for claims based on the intentional tortious conduct of federal employees, and the exception for certain torts committed by investigative or law enforcement officers does not apply to TSA screeners." Dkt. # 11, at 9-10. Plaintiff responds that TSA screeners are included in the investigative or law enforcement officer exception as to the FTCA sovereign immunity waiver. Dkt. # 13, at 9-17.

According to the Supreme Court, "[t]he FTCA was designed primarily to remove the sovereign immunity of the United States from suits in tort." Millbrook v. United States, 569 U.S. 50, 52 (2013) (internal quotations omitted). "The Act gives federal district courts exclusive jurisdiction over claims against the United States for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of a federal employee acting within the scope of his office or employment." Id. (citing 28 U.S.C. § 1346(b)(1)) (internal quotations omitted). Notably, the general rule that waivers of the United States' sovereign immunity should be strictly construed does not apply in the FTCA context, because such narrow constructions run the risk of "defeating the central purpose of the statute[.]" Dolan v. United States Postal Serv., 546 U.S. 481, 491-92 (2006) (internal quotations omitted). However, "this broad waiver of sovereign immunity is subject to a number of exceptions set forth in [28 U.S.C.] § 2680." Millbrook, 569 U.S. at 52. Crucially, § 2680(h) "preserves the Government's immunity from suit for 'any claim arising out of assault, battery, false imprisonment, false arrest . . . .'" Id. (quoting 28 U.S.C. § 2680(h)).

Notwithstanding, "Congress carved out an exception to § 2680(h)'s preservation of the United States' sovereign immunity for intentional torts by adding a proviso covering claims that arise out of the wrongful conduct of law enforcement officers." Id. This exception, known as the "law enforcement proviso, . . . extends the waiver of sovereign immunity to claims for six intentional torts, including [false imprisonment], that are based on the acts or omissions of investigative or law enforcement officers." Id. at 52-53 (citing 28 U.S.C. § 2680) (internal quotations omitted). The law enforcement proviso defines "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h); see also Millbrook, 569 U.S. at 53. Therefore, the key inquiry in the instant case is whether TSA officers are investigative or law enforcement officers within the meaning of the law enforcement proviso, such that the waiver of the United States' sovereign immunity applies to plaintiff's false imprisonment claim.

To date, three circuits have addressed whether the law enforcement proviso applies to TSA officers. The Third Circuit, see Pellegrino v. United States of America Transp. Sec. Admin., 937 F.3d 164 (3d Cir. 2019), and Eighth Circuit, see Iverson v. United States, 973 F.3d 843 (8th Cir. 2020), have found that the law enforcement proviso does apply to TSA officers, but the Eleventh Circuit, see Corbett v. Transp. Sec. Admin., 568 Fed. App'x 690 (11th Cir. 2014), reached the opposite conclusion in an unpublished, non-precedential opinion.

The Eleventh Circuit was the first court to consider this issue, and found that TSA screeners are not officers of the United States government, because the "federal statutes governing airport security screening differentiate between federal employees of TSA and law enforcement officers." Corbett, 568 Fed. App'x at 701. In other words, because TSA screeners are not empowered to carry

6

a firearm or make arrests under the relevant airport security screening statute, they are not officers of the United States government within the meaning of the law enforcement proviso.

On the other hand, the Third Circuit, in an en banc opinion, analyzed every discrete element of the law enforcement proviso as to TSA officers (TSO); that is, "are TSOs (1) officers of the United States who are (2) empowered by law to (3) execute searches for (4) violations of Federal law?" Pellegrino, 937 F.3d at 170 (internal quotations and alterations omitted). For the first element, the Third Circuit found that the plain meaning of the word "officer" is "one holding a position of trust and authority[.]" Id. (internal quotations omitted). Accordingly, the Third Circuit found that TSA officers are "officers" under the proviso because they 1) serve in positions of trust and authority--they "protect travelers from hijackings, acts of terror, and other threats to public safety"; 2) they are "officers by name"; and 3) "wear uniforms with badges noting [the officer] title." Id. For the second element, the Third Circuit examined TSA officers' statutory authority, finding that they are empowered by law "to conduct 'the screening of all passengers and property[,]'" and the statute's definition of "screening" includes a "physical search." Id. at 172 (quoting 49 U.S.C. § 44901(a)). For the third element, the Third Circuit found that TSA officers' searches are "searches (i) as a matter of ordinary meaning, (ii) under the Fourth Amendment, and (iii) under the definition provided in *Terry v. Ohio*, 392 U.S. 1 (1968)." Id. (internal quotations and citations omitted). Finally, for the fourth element, the Pellegrino court cast doubt on whether "for violations of Federal law" even applies to the power to "execute searches" under the proviso, because the "rule of the last antecedent" would "modify only the last antecedent, 'make arrests,' not 'execute searches.'" Id. at 177. Notwithstanding, the court concluded that, even if "for violations of Federal law" modified "execute searches[,]" TSA officers "do execute searches 'for violations of federal law'"; for

7

example, TSA officers "search for weapons and explosives, and carrying them on board an aircraft is a criminal offense." Id.

Finally, the Eighth Circuit decision followed a similar logic to Pellegrino's en banc majority opinion in finding that the law enforcement proviso applies to TSA officers. Compare Iverson, 973 F.3d at 847-54, with Pellegrino, 937 F.3d at 170-77. Specifically, the Eighth Circuit concluded that TSA officers are officers within the meaning of the FTCA law enforcement proviso, because 1) "TSA holds them out to the public as officers through their title and uniforms"; 2) the proviso's "use of the term *any* before *officers* does not favor a narrow definition"; and 3) TSA officers fall within the ordinary meaning of the word "officer" from the time that Congress enacted the FTCA. Additionally, the Eighth Circuit found that TSA officers are empowered by law to execute searches under the Airport Transportation Security Act (ATSA). Iverson, 973 F.3d at 848-49. Moreover, the Eighth Circuit rejected the argument that, under the noscitur a sociis (a word is defined by its neighbors) canon of statutory interpretation, the term "execute searches" is limited by "seize evidence" and "make arrests[,]" which are traditional police powers. Specifically, the Eighth Circuit found that noscitur a sociis is appropriate where a word is ambiguous or obscure in meaning only; moreover, the fact that the list in the proviso is joined in the disjunctive provides further support for the court's rejection of the use of that canon. Id. at 853. The Iverson court acknowledged that traditional law enforcement officers are contemplated in the proviso, but "nothing in the language of the proviso [] prevent[s] TSOs from also being included as they perform their specialized searches to ensure public safety and national security." Id.

For all the reasons set forth in the Eighth Circuit opinion and Third Circuit en banc opinion, the Court finds that TSA officers are officers within the meaning of the FTCA's law enforcement

8

proviso. Here, plaintiff sufficiently pled in her false imprisonment claim (count 1) that her allegations are based on the conduct of two TSA officers acting within the scope of their employment. See Millbrook, 569 U.S. at 52-53; Iverson, 973 F.3d at 854-55; Pellegrino, 937 F.3d at 177. Therefore, the Court finds that 1) the United States' waiver of sovereign immunity under the FTCA applies to this case; 2) the Court has exclusive jurisdiction over such claims; and 3) defendant's motion to dismiss plaintiff's false imprisonment claim (count 1) under Rule 12(b)(1) for lack of subject-matter jurisdiction should be denied.

  b. *Defendant's Motion to Dismiss Plaintiff's IIED Claim Under Rule 12(b)(1)*

Defendant argues that, because "the IIED claim arises out of, and indeed depends on, the same factual allegations underlying the false imprisonment claim[,]" plaintiff's IIED claim is "barred if it is fundamentally predicated on alleged conduct that is essential to one of the listed torts" in the FTCA's exception to the United States' waiver of sovereign immunity. Dkt. # 11, at 27-29. At bottom, defendant's motion to dismiss plaintiff's IIED claim under Rule 12(b)(1) is predicated on the Court dismissing plaintiff's false imprisonment claim for lack of subject-matter jurisdiction. However, as discussed in Part III.a, supra, the Court has exclusive jurisdiction over the matter; therefore, defendant's motion to dismiss plaintiff's IIED claim under Rule 12(b)(1) should be denied.

  c. *Defendant's Motion to Dismiss Plaintiff's IIED Claim Under Rule 12(b)(6)*

Defendant further argues that, even if the Court finds that it has exclusive jurisdiction over plaintiff's IIED claim, the claim should still be dismissed under Rule 12(b)(6), because "[t]he factual allegations pled in the [c]omplaint are insufficient to plausibly establish the required elements of IIED under Oklahoma law." Id. at 29. Specifically, defendant argues that plaintiff's allegations do

9

not sufficiently plead "extreme and outrageous conduct" and "severe emotional distress[,]" as required under Oklahoma law. Id. at 30.

Plaintiff's IIED claim against defendant is brought pursuant to the FTCA, and the Court must apply state substantive law to determine whether defendant can be held liable. Hill v. SmithKline Beecham Corp., 393 F.3d 111, 1117 (10th Cir. 2004). According to the Supreme Court of Oklahoma, "[t]o recover damages for intentional infliction of emotional distress, a plaintiff must prove: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." Comput. Publ'ns, Inc. v. Welton, 49 P.3d 732, 735 (Okla. 2002). "The trial court acts as a gatekeeper regarding the outrageousness of the defendant's conduct and the severity of the plaintiff's distress." Id. The second element of this tort, whether the conduct was extreme and outrageous, "requires proof that the defendant's conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and that such conduct is regarded as atrocious and utterly intolerable in a civilized community." Id. The fourth element, whether the resulting emotional distress was severe, "requires proof that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it." Id. at 736 (internal quotations and alterations omitted). "While emotional distress includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea, it is only where the emotional distress is extreme that liability arises." Id. (internal quotations omitted).

Here, even assuming arguendo that the TSA officers' conduct satisfied the second element, plaintiff does not plead facts that plausibly establish the fourth element--that her emotional distress

is sufficiently severe under Oklahoma law. For example, plaintiff alleged that during the incident, she "experienced symptoms of a panic attack, including racing heart, shortness of breath, uncontrollable shaking, and nausea." Dkt. # 2, at 5. Plaintiff further alleges that when she is reminded of the event, she experiences those symptoms, as well as additional symptoms such as: "fear of loss of control of her body, sweating, tightness in throat," and so forth. Id. Consequently, plaintiff tries to "avoid thinking about the event or talking with others about the event." Id. Notwithstanding, plaintiff still regularly travels by plane for work, but is "regularly reminded of the incident . . . no [fewer] than several times per month." Id. at 6. The Supreme Court of Oklahoma's legal standard for severe emotional distress requires a showing that the emotional distress is so severe that no reasonable person could be expected to endure it. Applying Oklahoma's standard, the Tenth Circuit, in Zeran v. Diamond Broadcasting, Inc, 203 F.3d 714, 721 (10th Cir. 2000), was influenced not "by the fact that [p]laintiff did not seek professional treatment and did not discuss his distress with those closest to him[,] . . . [but] by the lack of evidence showing that the distress interfered with [p]laintiff's ability to conduct his daily life affairs." Here, too, plaintiff's continued frequent plane travel, despite the alleged symptoms of emotional distress, weighs heavily against her ability to establish that no reasonable person could be expected to endure such a level of emotional distress. In other words, based on the allegations contained in the complaint, plaintiff's levels of emotional distress are not so severe as to cause her to discontinue traveling by plane several times per month, and they are not so extreme such that she is unable to do her job that requires frequent plane travel. In sum, the Court finds that plaintiff's allegations of emotional distress are not legally sufficient to plead a plausible IIED claim; thus, defendant's motion to dismiss plaintiff's IIED claim (count 2) should be granted for failure to state a claim.

**IT IS THEREFORE ORDERED** that defendant's motion to dismiss (Dkt. # 11) is **denied in part** as to dismissing plaintiff's false imprisonment claim (count 1) and IIED claim (count 2) under Rule 12(b)(1); and **granted in part** as to dismissing plaintiff's IIED claim (count 2) under Rule 12(b)(6).

**IT IS FURTHER ORDERED** that defendant shall file an answer regarding the remaining claim.

**DATED** this 9th day of August, 2022.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE